*D.L. v. Sheppard Pratt Health System Inc., et al.*, No. 38, September Term, 2018.  Opinion by Getty, J.

**ACTION—GROUNDS AND CONDITIONS PRECEDENT—MOOT, HYPOTHETICAL OR ABSTRACT QUESTIONS**
The Court of Appeals held that a juvenile's petition for judicial review of her involuntary admission was not moot based simply upon her release.  The involuntary admission subjected the juvenile to sufficient possible collateral consequences to justify judicial review of her involuntary admission, despite her release.

Circuit Court for Howard County
Case No. 13-C-15-103393
Argued: January 4, 2019

IN THE COURT OF APPEALS
OF MARYLAND

No. 38

September Term, 2018

---

D.L.

v.

SHEPPARD PRATT HEALTH SYSTEM, INC., *et al.*,

---

Barbera, C.J.
*Greene,
McDonald,
Watts,
Hotten,
Getty,
Rodowsky, Lawrence F.
(Senior Judge, Specially Assigned),

JJ.

---

Opinion by Getty, J.

---

Filed: August 13, 2019

*Greene, J., now retired, participated in the hearing and conference of this case while active an member of this Court; after being recalled pursuant to the Maryland Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.



Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.

Suzanne C. Johnson, Clerk

In 2015, an Administrative Law Judge ("ALJ") involuntarily admitted Petitioner, D.L., to a facility operated by Respondent, Sheppard Pratt Health Systems, Inc. ("Sheppard Pratt") in Ellicott City, Maryland. After D.L. was released from Sheppard Pratt, she filed a petition for judicial review in the Circuit Court for Howard County challenging her involuntary admission. Without holding a hearing, the circuit court granted Sheppard Pratt's motion to dismiss on grounds of mootness because D.L. had already been released from the facility. Accordingly, the primary issue within this case is whether judicial review of an ALJ's involuntary admission decision is mooted by the juvenile's release.[1]

Ultimately, we hold that D.L. is subject to collateral consequences stemming from her involuntary admission and, therefore, the circuit court erred in dismissing the case as moot. In accordance with this determination, we remand the case to the circuit court for further proceedings on D.L.'s petition for judicial review. Although D.L. also presents us with an issue of whether the Court of Special Appeals erred in determining she failed to preserve the capable of repetition yet evading review exception to the mootness doctrine, we need not resolve this inquiry based on our conclusion regarding collateral consequences.

---

[1] We note that D.L. did not present this Court with the meritorious issue of her petition for judicial review, i.e. whether a less restrictive form of intervention was available. Therefore, we are merely tasked with determining whether the circuit court erred in dismissing D.L.'s petition for judicial review as moot. More information on this unique procedural posture will be provided throughout our analysis.

# BACKGROUND

A fourteen-year-old girl, D.L., presented at the emergency department of MedStar Southern Maryland Hospital ("MedStar Southern") with fresh cut wounds along her left arm stretching from her elbow to her wrist. In addition to the new cuts, the arm of D.L. displayed scars from prior cuts. D.L. confessed to staff that the superficial wounds and scars were self-inflicted using a razor blade.

According to the testimony of Katie Krauch, a hospital representative for Sheppard Pratt at Ellicott City, before an ALJ, D.L. was brought to MedStar Southern by a police officer from Prince George's County. After being examined by two physicians, she was certified with a "diagnosis of other specified depressive disorder with the following symptoms, impulsive disturbance in eating and sleeping, poor insight and judgment, engaging in self-mutilation."

Ms. Krauch testified that Dr. Banks, one of the physicians at MedStar Southern who evaluated D.L., wrote that the patient was in need of institutional inpatient care and treatment because the she was impulsive, had severely impaired insight and judgment, and felt helpless and hopeless. In addition, Ms. Krauch summarized the assessment made by Dr. Banks that

> [D.L.] presents a danger to her own life or [the] life or safety of others because the patient is severely depressed and recently engaged in self-mutilation which places her at great risk of self-harm. The patient is unable to be voluntarily admitted as evidenced by the patient is a minor and in the care and custody of [the local Department of Social Services ("DSS")] and [Child Protective Services ("CPS")]. There is no less restrictive [form of intervention] than in-patient psychiatric care available for the patient which

2

is consistent with [her] welfare and safety and that the severity of the patient's symptoms places her in need of 24 hour care and supervision[.][2]

Based upon this assessment, D.L. was initially confined to Sheppard Pratt-Ellicott City on March 26, 2015. The ALJ conducted the hearing at Sheppard Pratt-Ellicott City on April 7. In addition to the testimony of Ms. Krauch cited above, the attending psychiatrist, Dr. Laura Seidel, testified. Regarding the need for D.L. to be involuntarily committed, Dr. Seidel stated that,

> [s]he exhibits symptoms of severe depression where she's had decreased energy, hypersomnia where she's been in bed pretty much for the past 24 hours, not participating in the activities and the groups on the unit. Some decrease in appetite and she has expressed some hopelessness about, you know, the discharge plans that her DSS worker is, is kind of forming with myself and the team.

When the ALJ asked Dr. Seidel whether D.L. represents a danger to herself or others, Dr. Seidel responded,

> I do, partly because she [ ] has been in [ ] three foster homes and the last one that she went in when she finally became hopeless, towards the end she ended up going to a store and bought a razor blade and cut herself actually in the store, you know, multiple marks on her arms. And I feel like she could be at risk of doing that again if she had access to a sharp object and given her level of depression and her hopelessness.

Dr. Seidel added her opinion that she did not believe D.L. was a danger to others but only to herself. Her conclusion was primarily based on D.L.'s earlier self-injurious behavior.

---

[2] Although the transcript reflects that Ms. Krauch testified that D.L. was "in the care and custody of DSS and CCS[,]" we believe the reference to "CCS" is the result of a transcription error. Instead, Ms. Krauch was likely referring to CPS.

Before the ALJ, the primary point of contention was whether a less restrictive form of intervention was available at the time. When asked, Dr. Seidel testified that she did not believe such an alternative was available due to a lack of available placement beds. Based upon her earlier discussions with an individual from the DSS, Dr. Seidel noted that they were attempting to place D.L. at two alternative facilities, the Berkeley & Eleanor Mann School and Residential Treatment Center at the Sheppard Pratt Towson Campus ("Mann RTC") and Stone Bridge psychiatric respite facility ("Stone Bridge").[3] However, she indicated that at the time, both facilities lacked an available bed for admission.

Regarding the availability of space at Mann RTC, Dr. Seidel testified that, "[a]t this point[,] they're still working on the insurance authorization but she has been accepted and we're hoping that there will be a bed, there is a bed available that the insurance will come through, you know, by Friday of this week." Concerning placement at Stone Bridge, she testified that:

> The other option [ ] presented is [Stone Bridge] . . . which there may be an opening today but there may not. [A DSS employee], you know, [ ] would look into that if [D.L.] was released but she did not say that there was a definite spot at [Stone Bridge] where she could be placed today.

---

[3] Stone Bridge is a psychiatric respite facility program offered by Brook Lane Health Services, Inc. which is headquartered in Hagerstown, MD. Mann RTC is a "63-bed licensed residential treatment center located on [Sheppard Pratt's] historic campus in Towson, Maryland" that focuses on the treatment of adolescents with emotional or behavioral disabilities by providing "24-hour care in a supportive and nurturing environment." The Berkeley & Eleanor Mann School and Residential Treatment Center | Sheppard Pratt Health Systems *available at:* https://www.sheppardpratt.org/care-finder/the-berkeley-amp-eleanor-mann-school-and-residential-treatment-center/ (https://perma.cc/GFH3-Y7BD) (last visited Aug. 12, 2019). Before the ALJ, Dr. Seidel testified that D.L. had previously stayed at Mann RTC.

4

However, Dr. Seidel also testified that D.L. did not wish to return to Mann RTC. Instead, she preferred placement in a therapeutic foster home.

Based on this testimony, Sheppard Pratt argued that there was no less restrictive form of intervention available at the time, and, therefore involuntary admission was appropriate under § 10-617(a)(5) of the Health–General Article ("HG"). Whether an institution offers a form of intervention rightfully considered a less restrictive alternative form of intervention generally depends upon the level of supervision and security within an institution and the extent to which a patient retains individual autonomy. In-patient facilities such as foster care, therapeutic foster care, group homes, independent/alternative living programs, residential treatment centers, behavioral programs, and, in some situations, out-patient care are considered less restrictive forms of intervention compared to psychiatric hospitals. *See generally* 2018 Data Resource Guide, Section IV: Committed Programs, Maryland Department of Juvenile Services at 139-140, 160, *available at:* https://djs.maryland.gov/Documents/DRG/Data_Resource_Guide_FY2018_full_book.pdf (https://perma.cc/ST98-VEUJ) (last visited Aug. 12, 2019) (outlining and explaining the types of psychological treatment programs available to adolescents within the State). Accordingly, in the instant appeal, Mann RTC and Stone Bridge both constitute less restrictive forms of intervention when compared to involuntary admission at Sheppard Pratt.

The ALJ concluded that there was clear and convincing evidence that D.L.: (i) was diagnosed with major depressive disorder; (ii) presented a danger to her own life and safety; (iii) was in need of institutional care or treatment; (iv) was insufficiently assisted

under her current placement in therapeutic foster care; and (v) if released, there was a substantial likelihood that she would resort to self-injurious behavior again in the future. In addition, the ALJ concluded that there was clear and convincing evidence that no less restrictive form of intervention, consistent with D.L.'s welfare, was available at the time. On this issue, the ALJ commented, "I have the possibility that something might or might not be available today. That is not clear and convincing that [a less restrictive form of] intervention is available."

Subsequently, D.L. filed a petition for judicial review of the ALJ's decision, pursuant to HG § 10-633, in the Circuit Court for Howard County on May 1, 2015. In her petition for judicial review, the sole issue presented was whether there was sufficient evidence that no less restrictive form of intervention was available. In response, on June 18, 2015, Sheppard Pratt filed a motion to dismiss alleging that the controversy was moot because D.L. had been released from Sheppard Pratt on April 10, 2015. Thereafter, the parties exchanged numerous responsive motions.[4] Subsequently, the circuit court granted

---

[4] The responsive motions included: (i) "[Sheppard Pratt's] Memorandum. . . in Support of Motion to Dismiss"; (ii) "[D.L.'s] Answer to Motion to Dismiss"; (iii) "[Sheppard Pratt's] Reply Memorandum . . . in Support of Motion to Dismiss"; (iv) "[D.L.'s] Motion to Strike Motion to Dismiss"; (v) "[Sheppard Pratt's] Memorandum . . . In Opposition to Petitioner's Motion to Strike Motion to Dismiss"; (vi) "[D.L.'s] Response to Memorandum of Sheppard Pratt Health System in Opposition to Petitioner's Motion to Strike Motion to Dismiss"; (vii) "[D.L.'s] Motion to Strike [Sheppard Pratt's] Reply Memorandum in Support of Motion to Dismiss"; (viii) "[Sheppard Pratt's] Response to Petitioner's Motion to Strike Sheppard Pratt's Reply Memorandum in Support of Motion to Dismiss"; (ix) "[Sheppard Pratt's] Memorandum of Law in Opposition to Petition for Judicial Review"; and (x) D.L.'s request for postponement.

Sheppard Pratt's motion to dismiss, without holding a hearing, in an order dated July 28, 2015 on the basis that the case was moot due to D.L.'s release.

D.L. then filed a motion to alter or amend the circuit court's order in which she argued that the circuit court erred by dismissing her petition for judicial review on August 12, 2015 without holding a merits hearing. Specifically, she argued that she was entitled to a hearing on the merits under Maryland Rule 7-208(b) that provides that after the record associated with an administrative law judge's decision is filed in the circuit court, the court shall set a date for a "hearing on the merits." The circuit court disagreed and again without holding a hearing issued an order dated September 15, 2015, that denied D.L.'s motion to alter or amend. Following D.L.'s first motion to alter or amend, but preceding the circuit court's disposition on the motion, D.L. filed a second motion to alter or amend on August 24, 2015 arguing that the circuit court erred in denying her motion to strike Sheppard Pratt's "Reply Memorandum in Support of Motion to Dismiss[.]" The circuit court denied her second motion to alter or amend on October 5, 2015. On October 16, 2015, D.L. filed a notice of appeal in the circuit court to appeal its decision to the Court of Special Appeals.

Before the intermediate appellate court, the parties filed a joint motion to remand the case to the circuit court. The motion was primarily based on the circuit court's failure to hold a hearing in the case. Paragraph 12 of the motion provided the basis on which the parties agreed remand was warranted:

> The parties are in accord that justice will be served by remanding the matter [to] the Circuit Court for a hearing. In particular, the parties request a remand for the Circuit Court to first consider after argument Appellee Sheppard Pratt Health[] System's Motion to Dismiss. Thereafter, depending on the

7

disposition of that motion, the Circuit Court may also consider after argument [D.L.]'s Petition for Judicial Review.

The parties also stipulated in the motion that no further briefing was required and that the court should remand solely for the purposes of conducting a hearing. On May 9, 2016, the Court of Special Appeals granted the motion, stayed the appeal, and remanded "for the limited purpose of conducting a hearing on the motion filed by [Sheppard Pratt.]"

On October 13, 2016, in accordance with the intermediate appellate court's remand, the circuit court held a hearing on Sheppard Pratt's motion to dismiss. Therein, the circuit court judge commented that it was unclear what was before him due to the unusual procedural posture of the case. The judge explained that motions to dismiss originating from administrative appeals are rather uncommon and expressed confusion over what materials are encompassed in the record and should rightfully be considered.

The hearing transcript reveals that there was also an issue as to the scope of the circuit court's review on remand. Counsel for D.L. argued that she was entitled to a hearing on the merits and that dismissal based on mootness is inappropriate within the context of judicial review of involuntary admission decisions. In addition, counsel for D.L. made an additional argument indicating that the potential of collateral consequences stemming from involuntary admissions may overcome mootness. In contrast, Sheppard Pratt argued that the hearing was limited to mootness, D.L. had been released from commitment, the case lacked a justiciable controversy, and therefore the circuit court's earlier dismissal as moot was warranted. In reference to the scope of the hearing, the judge commented several times that the remand was limited in nature:

8

Because I think the only thing I'm authorized to do today is to conduct a hearing on the issue of mootness

\* \* \*

Quite frankly, when I review the transcript [of the ALJ hearing], it does seem to me that [Sheppard Pratt presented sufficient evidence that no less restrictive form of intervention was available]. But I'm just here to make a determination as to whether or not the case has become moot because she was discharged three days later.

\* \* \*

But would you agree with me that, that the remand in this particular case was very specific and narrow in that I was directed to conduct a hearing essentially on the issue of the Motion to Dismiss.

On November 4, 2016, the circuit court issued its memorandum and order. Therein, the court analyzed two questions: (i) whether D.L.'s petition for judicial review was moot; and (ii) if the petition was moot, should Sheppard Pratt's motion to dismiss be granted? The circuit court first found that D.L.'s petition was moot because she had already been released. The circuit court commented, "[t]he only status of which [D.L.] complains no longer exists. Under these facts and circumstances, [D.L.]'s Petition is moot."

Second, the court analyzed whether the public interest exception to the mootness doctrine applied. Relying primarily on *Lloyd v. Supervisors of Elections*, the circuit court determined that the public interest exception was not implicated. 206 Md. 36, 42—43 (1954). In particular, the circuit court determined that D.L. presented insufficient evidence that the matter would frequently recur. Accordingly, the circuit court's order granted Sheppard Pratt's motion to dismiss and dismissed the case. On November 28, 2016, D.L.

9

filed a notice of appeal in the circuit court and appealed its second dismissal of her petition for judicial review to the Court of Special Appeals.

In an unreported opinion dated February 12, 2018, the intermediate appellate court affirmed the judgment of the circuit court and held that the case was moot. *In re D.L.*, No. 2463 Sept. Term, 2015, 2016 WL 7159506 (Md. Ct. Spec. App. Dec. 8, 2016). Rather than dismissing the appeal by order, the Court of Special Appeals considered mootness on its merits including arguments concerning collateral consequences and exceptions to the mootness doctrine.[5] The primary thrust of the Court of Special Appeals' analysis was whether possible collateral consequences existed because of D.L.'s involuntary admission. The court considered several areas in which D.L. alleged the existence of collateral consequences including restrictions on future employment, firearm ownership, driving license privileges, immigration, and the social stigmatization of mental illness. Ultimately, however, the court held that any possible collateral consequences originating from D.L.'s involuntary admission already existed because of her prior stay at Mann RTC. Second, the court held that the public concern exception to the mootness doctrine was inapplicable and arguments concerning the capable of repetition, yet evading review exception were not made in the courts below and therefore, not properly preserved.

---

[5] *See In re Kaela C.*, 394 Md. 432, 452—53 (2006) (indicating that, based on a prohibition against offering advisory opinions, courts rarely address mootness on its merits and frequently dismiss such appeals by order).

Subsequently, D.L. petitioned this court for writ of certiorari, which we granted. *D.L. v. Sheppard Pratt Health System*, 461 Md. 480 (2018). In her petition for writ of certiorari, D.L. presents us with two questions for review:

1. Did the Court of Special Appeals err in concluding that D.L.'s challenge to her involuntary admission was moot and, alternatively, that no exception to the mootness doctrine applied?

2. Did the Court of Special Appeals err in concluding that the applicability of the capable-of-repetition-yet-evading-review exception to the mootness doctrine was not preserved for appellate review?

**STANDARD OF REVIEW**

When reviewing the grant of a motion to dismiss, the appropriate standard of review "is whether the trial court was legally correct." *Blackstone v. Sharma*, 461 Md. 87, 110 (2018) (quoting *Davis v. Frostburg Facility Operations, LLC*, 457 Md. 275, 284 (2018)). Therefore, "[w]e review the grant of a motion to dismiss de novo. We will affirm the circuit court's judgment 'on any ground adequately shown by the record, even one upon which the circuit court has not relied or one that the parties have not raised.'" *Sutton v. FedFirst Fin. Corp.*, 226 Md. App. 46, 74 (2015) (citations omitted), *cert. denied*, *Sutton v. FedFirst Fin.*, 446 Md. 293 (2016).

**DISCUSSION**

We begin our analysis with a brief discussion of the procedural framework surrounding involuntary admissions. Title 10 Subtitle 6 of the Health–General Article ("HG") regulates the admissions of individuals, either voluntary or involuntary, to certain facilities. Pursuant to HG § 10-613, an involuntary admission "includes every admission of a minor to a State facility unless the admission is [ ] voluntary[.]" HG § 10-613. A

11

"facility" is statutorily defined as "any public or private clinic, hospital, or other institution that provides or purports to provide treatment or other services for individuals who have mental disorders." HG § 10-101(g)(1).[6] Before an individual can be involuntarily admitted, several statutorily enumerated factors must be met. HG § 10-617(a), in pertinent part, provides these factors and limits the applicability of involuntary admission to situations where,

(1) The individual has a mental disorder;

(2) The individual needs inpatient care or treatment;

(3) The individual presents a danger to the life or safety of the individual or of others;

(4) The individual is unable or unwilling to be admitted voluntarily; and

(5) There is no available less restrictive form of intervention that is consistent with the welfare and safety of the individual.

In the present appeal, D.L. sought judicial review of the ALJ's admission decision with respect to only one of these factors—the fifth. In other words, D.L. presented only one issue in her petition for judicial review: whether there was sufficient evidence presented to the ALJ that no less restrictive form of intervention was available. We now turn our analysis to a consideration of the mootness doctrine generally and application and analysis of the collateral consequences doctrine.

---

[6] The provision specifically notes that Veterans' Administration Hospitals do not constitute "facilities." HG § 10-101(g)(2).

12

Generally, a case is moot if no controversy exists between the parties or "when the court can no longer fashion an effective remedy." *In re Kaela C.*, 394 Md. 432, 452 (2006); *Adkins v. State*, 324 Md. 641, 646 (1991). This Court's reluctance to hear moot cases stems from the prohibition against offering advisory opinions. *In re Kaela C.*, 394 Md. at 452 (citing *In re Rosa A. Riddlemoser*, 317 Md. 496, 502 (1989)). However, there are several cases in which an appeal can ostensibly appear moot, yet appellate review is warranted. First, mootness will not preclude appellate review in situations where a party can demonstrate that collateral consequences flow from the lower court's disposition. *Adkins*, 324 Md. at 645—46. See also *Lane v. Williams*, 455 U.S. 624, 632 (1982). Second, there are several exceptions to the mootness doctrine of which two are applicable in the instant appeal, namely the capable of repetition yet evading review and the public concern exceptions. However, as we conclude that D.L. faces collateral consequences stemming from her involuntary admission, we need not analyze these exceptions to the mootness doctrine.

The collateral consequences doctrine was first adopted by the Supreme Court in 1943. *See St. Pierre v. U.S.*, 319 U.S. 41, 42 (1943). In *St. Pierre*, a defendant confessed to embezzlement while testifying before a grand jury but declined to disclose the identity of the individual from whom he embezzled. *Id.* As a result, the district court held the defendant in contempt and sentenced him to five months imprisonment. *Id.* On appeal, the United States Court of Appeals for the Second Circuit affirmed the district court's judgment. *Id.* Despite his release from custody, the defendant then filed a petition for writ of certiorari with the Supreme Court raising issues regarding the constitutional privilege

13

against self-compelled incrimination. *Id.* The Court held the defendant's challenge was moot commenting:

> On the argument it was conceded that petitioner had fully served his sentence before certiorari was granted. We are of opinion that the case is moot because, after petitioner's service of his sentence and its expiration, there was no longer a subject matter on which the judgment of this Court could operate. A federal court is without power to decide moot questions or to give advisory opinions which cannot affect the rights of the litigants in the case before it. The sentence cannot be enlarged by this Court's judgment, and reversal of the judgment below cannot operate to undo what has been done or restore to petitioner the penalty of the term of imprisonment which he has served. **Nor has petitioner shown that under either state or federal law further penalties or disabilities can be imposed on him as a result of the judgment which has now been satisfied**. In these respects the case differs from that of an injunction whose command continues to operate in futuro even though obeyed.

*St. Pierre*, 319 U.S. at 42–43 (emphasis added) (citations omitted). The emphasized text represents the emergence of the collateral consequences doctrine. [7]

Three years after its decision in *St. Pierre*, the Supreme Court further developed the collateral consequences doctrine hinted at in its earlier opinion. *See Fiswick v. United States*, 329 U.S. 211, 213 (1946). In *Fiswick*, several German nationals were convicted of conspiring to defraud the United States government. *Id.* Prior to judicial review, one of the defendants was released from custody. *Id.* at 229. Ultimately, the Supreme Court held that the defendant's challenge to his conspiracy conviction was not moot because of the potential collateral consequences stemming from it. *Id.* at 221. Particularly, the Supreme Court determined that, due to Mr. Fiswick's status as an "alien[,]" he could be subjected to

---

[7] At this point in time, the collateral consequences doctrine had yet to develop its current moniker.

14

deportation for committing a crime involving moral turpitude within five years after his entry into the United States. *Id.*

The Supreme Court commented that there were several other consequences stemming from Mr. Fiswick's conviction including potential deportation, limiting his ability to become naturalized, his voting rights, his ability to hold public office, and his ability to participate on a federal jury. *Id.* at 222. Therefore, based on these consequences stemming from Mr. Fiswick's conviction, the Supreme Court commented that "[i]n no practical sense, [ ] can Fiswick's case be said to be moot." *Id.*

Next, the Supreme Court considered whether a defendant who served his sentence on a federal conviction, but was then convicted on state charges and subject to a longer sentence based on his prior federal conviction, was "entitled to an opportunity to attempt to show that his conviction was invalid" through a writ of *coram nobis*. *See U.S. v. Morgan*, 346 U.S. 502, 511—512 (1954). The Court reasoned that the defendant's sentence was not moot even though "the term has been served, [because] the results of the conviction may persist. Subsequent convictions may carry heavier penalties, civil rights may be affected." *Id.* at 512—13.

Subsequently, the collateral consequences doctrine emerged and was formally named in *Pollard v. United States*, 352 U.S. 354, 358 (1957). In that case, a defendant sought review of the validity of a probation order entered when he was not present in the courtroom. *Id.* at 356. The defendant was later sentenced to incarceration based upon a subsequent violation of his probation as initially ordered. *Id.* at 357. However, he had been released from detention after the Supreme Court granted his petition for certiorari.

15

*Id.* at 358. Therefore, on this issue, the Supreme Court determined that there were sufficient collateral consequences to overcome the mootness that characterized the case. *Id.* The Court commented, "that convictions may entail collateral legal disadvantages in the future" and concluded that "[t]he possibility of consequences collateral to the imposition of sentence is sufficiently substantial to justify our dealing with the merits." *Id.* (citing *Morgan*, 346 U.S. at 512—13 and *Fiswick*, 329 U.S. at 220—23.)

The Supreme Court subsequently refined and expanded the collateral consequences doctrine. In *Carafas v. Lavallee*, the Supreme Court held that an appeal was not moot where a defendant had served his sentence and was released while his petition for habeas corpus had yet to be adjudicated. 391 U.S. 234, 237—38 (1968). In considering the potential collateral consequences stemming from the defendant's conviction, the Supreme Court cited several:

> In consequence of his conviction, he cannot engage in certain businesses; he cannot serve as an official of a labor union for a specified period of time; he cannot vote in any election held in New York State; he cannot serve as a juror. Because of these 'disabilities or burdens (which) may flow from' petitioner's conviction, he has 'a substantial stake in the judgment of conviction which survives the satisfaction of the sentence imposed on him.' On account of these 'collateral consequences,' the case is not moot.

*Id.* at 237—38 (citations and footnotes omitted).

Less than a month later, the Supreme Court recognized in *Sibron v. New York* "the obvious fact of life that most criminal convictions do in fact entail adverse collateral legal consequences." 392 U.S. 40, 55 (1968). In addition, the Supreme Court defined the standard with respect to collateral consequences indicating that there need only be a possibility of collateral consequence to justify overlooking the mootness of a case. *Id.* In

16

*Sibron*, the Supreme Court was tasked with determining whether a pre-trial motion to suppress evidence seized was moot where the defendant had served the entirety of his sentence. *Id.* at 45—49. The Supreme Court ultimately held that the case was not moot because of the potential collateral consequences that may flow from his prior conviction. *Id.* at 51, 56. Specifically, the Supreme Court noted that a New York statute would permit the State to impeach his character with evidence of his prior conviction if, in any subsequent criminal proceeding, he put his character at issue. *Id.* at 56. In addition, under another New York statute, trial judges were permitted to consider a defendant's prior convictions when sentencing for subsequent convictions. *Id.*

Subsequently, the Supreme Court further addressed the limits of collateral consequences in overcoming mootness. In *Lane v. Williams*, two defendants were arrested and pleaded guilty to unrelated Illinois burglary prosecutions. 455 U.S. 624, 624 (1982). At the time, the offense carried with it a mandatory three-year parole term. *Id.* However, neither of the defendants were informed at their respective plea hearings of the mandatory parole term. *Id.* Subsequently, both defendants completed their sentences, were released, and then later reincarcerated based upon parole violations. *Id.* While serving their sentences, the defendants filed petitions for federal habeas corpus in which they urged the court to release them immediately. *Id.* at 628. The United States District Court for the Northern District of Illinois granted both defendants' petitions, released them, and issued an order that their mandatory parole terms were void. *Id.* at 627—28. On appeal, the United States Court of Appeals for the Seventh Circuit determined that the case was not moot and reversed the decision of the district court, holding that the defendants had not

17

exhausted all available state remedies. *Id.* at 629. Primarily, the court determined that the appeal was not moot due to the potential collateral consequences stemming from the underlying parole violations. *Id.*

Ultimately, the Supreme Court held that the appeal was moot and the alleged collateral consequences were insufficient to justify overcoming mootness. *Id.* at 632—33. In reaching its conclusion the Court commented:

> No civil disabilities such as those present in *Carafas* result from a finding that an individual has violated parole. At most, certain non-statutory consequences may occur; employment prospects, or the sentence imposed in a future criminal proceeding, could be affected. The discretionary decisions that are made by an employer or a sentencing judge, however, are not governed by the mere presence or absence of a recorded violation of parole; these decisions may take into consideration, and are more directly influenced by, the underlying conduct that formed the basis for the parole violation. Any disabilities that flow from whatever respondents did to evoke revocation of parole are not removed-or even affected-by a District Court order that simply recites that their parole terms are "void."

*Id.* (citations and footnotes omitted).

Maryland has also interpreted and applied the collateral consequences doctrine and, in some cases, the prospect of such consequences have resulted in an appeal not being considered moot. In *Adkins v. State*, this Court considered "whether an appeal from an order revoking a defendant's probation and reimposing the previously suspended sentence is rendered moot by that defendant's completing service of his sentence while the appeal is pending." 324 Md. 641, 642 (1991). Therein, we echoed the framework set forth by the Supreme Court indicating that collateral consequences need not be concrete and actual; instead, a defendant must demonstrate "only the possibility of collateral legal consequences" to preclude a finding of mootness. *Id.* at 654. Further, the Court held that

there were possible collateral consequences stemming from the defendant's violation of probation, and therefore, the case was not moot. *Id.* at 654—56.

Thereafter, this Court held that a circuit court order which granted custody of children to their father over the mother's objection and which found that the children were in need of assistance was not moot despite California's assumption of jurisdiction. *In re Kaela C.*, 394 Md. at 475—76. In that case, the Court concluded that there were collateral consequences to justify engaging the issue on its merits. *Id.* at 464—65. Specifically, we noted that the California court relied upon the Maryland judgment in its own custody determinations. *Id.* at 465. In subsequent cases, we have identified the specific collateral consequences that flow from felony convictions:

> Significant collateral consequences flow from Petitioner's felony convictions for first-degree assault. For example, he is disqualified from jury service; regulated firearm possession; certain employment opportunities; and military service.

*Kranz v. State*, 459 Md. 456, 473 (2018) (footnotes omitted). This Court has also held that collateral consequences may also occur "in the form of substantial civil penalties" sufficient to overcome mootness. *McMannis v. State*, 311 Md. 534, 539 (citing *Carafas*, 391 U.S. at 237—38). In contrast, however, we have indicated that "minor, non-statutory, collateral consequences alone are insufficient to avoid mootness[.]" *McMannis*, 311 Md. At 539 (citing *Lane*, 455 U.S. at 632—33).

We have also undertaken an inquiry into the potential collateral consequences that may stem from restrictions on an individual's driving privileges. *Toler v. Motor Vehicle Admin.*, 373 Md. 214, 216 (2003). In that case, an ALJ suspended a defendant's license.

19

*Id.* at 219. Following the suspension, the defendant sought judicial review of the ALJ's decision after the suspension had expired. *Id.* at 218—19. We concluded that the case was not moot due to the collateral consequences stemming from the initial suspension. *Id.* Specifically, we determined that the defendant's prior license suspension, although moot, would influence any future suspensions and the associated penalties:

> If [the Defendant's] license is subsequently suspended, which, in light of his atrocious driving record, is more than a conjectural possibility, he will face a minimum period of suspension of fifteen days, rather than two days, and a maximum period of ninety days, rather than thirty days.

*Id.*

On prior occasions, Maryland courts have also wrestled with the specific issue presented in this appeal, i.e. whether a petition for judicial review of an involuntary admission is moot based on the patient's discharge from a facility. Last year, this Court considered what may rightfully be viewed as the predecessor to the instant appeal. In that case, a patient was diagnosed with bipolar disorder and eventually involuntarily admitted to a mental health facility. *In re J.C.N.*, 460 Md. 371, 380—384 (2018). There, the substantive issues on appeal were whether the hospital, i.e. the University of Maryland Baltimore Washington Medical Center, (i) complied with HG § 10-632(b) which requires an involuntary admission hearing within ten days of the date the patient is initially confined and (ii) whether the ALJ's involuntary admission decision was supported by substantial evidence. *Id.* at 385.

However, the importance of *In re J.C.N.* and its relation to the instant appeal lies not in the substantive issues engaged therein. Instead, a third question presented in J.C.N.'s

20

petition for certiorari that was not necessary to be decided and thus evaded this Court's review illuminates our present analysis. That third question was whether "an individual [may] challenge an involuntary admission after the individual has been discharged from the hospital, or does mere discharge render the appeal moot[.]" *Id.* at 386 n. 8. Ultimately, we declined to answer this question because the Department of Health and Mental Hygiene ("the Department") conceded at oral argument that the case was not moot due to the potential collateral consequences stemming from J.C.N.'s involuntary admission. *Id.* In short, *In re J.C.N.* identified the doctrine of collateral consequences within the context of involuntary admissions and brought to light that in many situations where a patient is released from involuntary admission prior to judicial review of the admission decision, collateral consequences likely exist and such consequences prohibit dismissal on mootness grounds.

On January 10, 2019, the Court of Special Appeals published an unreported opinion in a case which contained strikingly similar facts to the instant appeal. *In re A.B.*, No. 1680, Sept. Term, 2017, 2019 WL 290064 (Md. Ct. Spec App. Jan. 10, 2019). Although unreported opinions of our intermediate appellate court have no precedential value and do not constitute persuasive authority, we highlight this case merely to develop the history and varying perspectives on collateral consequences stemming from involuntary admissions and to illustrate the frequency in which this issue has entered our jurisprudential gaze. *See* Md. Rule 1-104. In that case, like here, an ALJ involuntarily admitted a patient, A.B., and she filed a petition for judicial review of the ALJ's decision. *Id.* at *2. The substantive issue within her petition for judicial review was whether substantial evidence

21

supported the ALJ's decision that she constituted a danger to herself. *Id.* at *6. Prior to the circuit court entertaining the petition, A.B. was discharged from the facility. *Id.* at *2. On this basis, the circuit court dismissed the petition as moot. *Id.* A.B. was a mother who sought to regain custody of her child and had previously been hospitalized at a psychiatric institution in Virginia. *Id.* at 4.

On appeal, A.B. argued that numerous collateral consequences stemmed from her involuntary admission. *Id.* In contrast, the Department argued that any collateral consequences emanating from involuntary admission of A.B. were previously generated by her stay at a psychiatric institution in Virginia. *Id.* at *6. Ultimately, the Court of Special Appeals rejected the Department's contentions and concluded that a litany of potential collateral consequences existed and that the record was insufficient to conclude that her stay at a psychiatric institution in Virginia was, in fact, an involuntary admission. *Id.* at *4—5.

Having reviewed the collateral consequences doctrine and its development since its inception on both the federal and State levels, we must next turn to the collateral consequences specifically alleged by D.L. In particular, D.L. contends that the collateral consequences of an involuntary admission are numerous in Maryland law. Moreover, she avers that these possible collateral consequences stemming from her involuntary admission warrant appellate review. The alleged collateral consequences include the following: (i) potential impact on her driving privileges; (ii) prohibiting D.L. from engaging in certain occupations; (iii) implications towards child custody disputes; (iv) restrictions on her immigration status; (v) prohibiting her from serving on a federal jury; (vi) implications

22

towards any future involuntary admissions; (vii) the social stigmatization of mental illness; (viii) certain statutory reporting requirements; and (ix) restricting her ability to own or possess certain firearms at the State and federal levels. Due to the sheer number of collateral consequences alleged, we must analyze each of the preceding consequences individually to determine their merit.

First, we consider whether possible collateral consequences stemming from D.L.'s involuntary admission exist that may potentially affect her ability to obtain a driver's license. D.L. is correct that an individual's right to acquire a driver's license may be limited by the applicant's mental health history. Section 16-103.1(3) of the Transportation Article ("TR") provides that the Maryland Motor Vehicle Administration may not issue a license to any individual "[w]ho previously has been adjudged to be suffering from any mental disability or mental disease and who, at the time of application, has not been adjudged competent[.]" However, based on the statute's language, an involuntary admission would not limit an individual's right to obtain a driver's license outright. The provision indicates that only those adjudged as incompetent without being later adjudged competent will be excluded from obtaining a license. TR § 103.1(3). At the time of her petition for judicial review, D.L. was not old enough to obtain a driver's license. However, she has now reached the necessary age, and the record contains no indication that she has been "adjudged as competent[.]" TR § 16-103.1(3). As a result, D.L.'s involuntary admission, in conjunction with this statutory requirement, will likely generate possible collateral consequences.

23

Second, D.L. argues that her involuntary admission will have significant collateral consequences that will limit her employment prospects in the future. Specifically, she contends that she will be prohibited from engaging in certain occupations. She first alleges that her involuntary admission could render her ineligible to work as a private security guard. Generally, for an individual to be employed as a security guard, he or she must obtain a certification card issued by the State Police. COMAR 29.04.01.02.A.

To obtain such a certification card, one must complete an application form setting forth certain information about the applicant's history, provide a photograph of the applicant, and his or her fingerprints. COMAR 29.04.01.02.B. D.L. draws our attention to a limiting provision which indicates that an application for a certification card may be denied if certain conditions are met. COMAR 29.04.01.02.E. One of these conditions indicates that a certification card may be denied if the applicant "[h]as been confined to a mental institution for treatment of a mental disorder or disorders[.]" COMAR 29.04.01.02.E(6). However, this regulation does not constitute an outright ban. A surrounding regulation provides an exception for certain individuals. *Id.* Specifically, the provision is inapplicable to those who "attach[ ] to the application a physician's certificate, issued within 30 days before the application, certifying that the applicant is of no danger to himself or others." *Id.*

D.L. contends that her employment prospects are further limited by her involuntary admission, arguing that the admission will preclude her from future employment as an employee of a private detective agency. Like the above discussion regarding security guards, the associated regulations provide that an individual who works as an employee for

24

a private detective must apply for, be approved, and receive an identification card. COMAR 29.04.08.03.A. The application process for a private detective identification card contains language identical to that found within regulation concerning security guard certification cards, i.e. COMAR 29.04.01.02.E(6). Just as with an individual's security guard certification card, an application for a private detective identification card may be denied if the applicant "[h]as been confined to a mental institution for treatment of a mental disorder or disorders[.]" COMAR 29.04.08.03.C(6). Likewise, this regulation provides the same exception found within the regulation concerning security guard certification cards. *Id.* (providing that the exclusion is inapplicable to applicants who attach a physician's certificate to the application indicating that the applicant no longer represents a danger to themselves or others).

Sheppard Pratt argues that these COMAR provisions mitigate any collateral consequences identified by D.L concerning restrictions on her future employment opportunities. COMAR 29.04.01.02.E(6); COMAR 29.04.08.03.C(6). As will be seen, this argument is a recurring theme throughout Sheppard Pratt's brief. However, our precedent reveals that we require only the possibility of collateral consequences to justify overlooking the mootness which characterizes an individual appeal. *See Adkins*, 324 Md. at 654. Although D.L. may have any potential restrictions on her employment capacity removed in the future, these restrictions currently exist and are rightfully characterized by D.L. as possible collateral consequences. This Court has never held that the *possibility* of collateral consequences may be sufficiently mitigated by statute or regulation to the extent that a case should be considered moot.

25

In addition, D.L. argues that, as a consequence of her involuntary admission, she will likely be ineligible for certain positions within the federal government that require a security clearance. She draws our attention to a specific form associated with the security clearance process, which requires an applicant to disclose whether he or she has ever been hospitalized for a mental health condition—including whether the admission was voluntary or involuntary. U.S. Office of Pers. Mgmt., "Questionnaire for National Security Positions," at 89, https://www.opm.gov/Forms/pdf_fill/SF86.pdf (https://perma.cc/7H4K-9N2Y)(last visited Aug. 12, 2019). The form also requires an applicant to disclose whether he or she has: (i) been diagnosed by a physician or other health professional with certain psychological disorders; (ii) any mental health conditions that would substantially adversely affect the applicant's judgment, reliability, or trustworthiness; (iii) been ordered by a court or administrative agency to consult with a mental health professional; and (iv) been declared mentally incompetent by a court or administrative agency. *Id.* However, the questionnaire provides that a history of mental illness or treatment alone will not outright preclude obtainment of a security clearance:

> The U.S. government recognizes the critical importance of mental health and advocates proactive management of mental health conditions to support the wellness and recovery of Federal employees and others. Every day individuals with mental health conditions carry out their duties without presenting a security risk . . . . most individuals with mental health conditions do not present security risks[.]

*Id.* Further, the questionnaire indicates that an applicant's history of mental health care is not dispositive as to whether the individual would qualify for a position that requires a security clearance:

26

> Mental health treatment and counseling, in and of itself, **is not a reason** to revoke or deny eligibility for access to classified information or for holding a sensitive position, suitability or fitness to obtain or retain Federal or contract employment, or eligibility for physical or logical access to federally controlled facilities or information systems. Seeking or receiving mental health care for personal wellness and recovery may contribute favorably to decisions about your eligibility.

*Id.* (alterations in original).

Although the associated forms make clear that an individual's application for a security clearance will not be denied solely on the basis of prior mental health treatment, the provision does not provide sufficient information regarding to what extent instances of past mental health treatment, including involuntary admissions, would play with respect to a security clearance determination. However, we are not convinced that a past involuntary admission will play no role in the security clearance application process. If this was the case, it would beg the question as to why the federal government would require such disclosure. More likely than not, a past involuntary admission will have some broad-reaching effect on an individual's ability to qualify for a security clearance. Therefore, we hold that D.L. faces possible collateral consequences regarding future employment based on her involuntary admission to Sheppard Pratt.

Third, D.L. argues that further collateral consequences stem from her involuntary admission within the sphere of any child custody disputes or child in need of assistance ("CINA") proceedings. In the instant appeal, the circuit court did not consider collateral consequences and therefore did not develop the record with respect to these relevant factual underpinnings. Nonetheless, records of a prior involuntary admission will likely become relevant within certain situations involving the custody or guardianship. For example,

27

Courts and Judicial Proceedings Article ("CJ") § 3-819.2 sets forth the factors that a court will consider in making a custody or guardianship determination in a CINA case. In such situations, a local department or licensed child placement agency must compile a report detailing "the suitability of the individual to be the guardian of the child." CJ § 3-819.2(f)(1)(iii). Such a report includes an inquiry into a parent or proposed guardian's mental health history. CJ § 3-819.2(f)(1)(iii). Within this report, any instances of involuntary or voluntary admissions will likely be brought to light and considered with respect to determining the fitness of a potential custodial parent or guardian.

In addition, an individual's history of mental health treatment and evaluation within the CINA context can have a greater impact than the report alone. CJ § 3-819.2(g) indicates that a "disability" of the potential custodial parent or guardian is relevant to the extent that "the disability affects the best interest of the child." The provision defines "disability" broadly in the following manner:

> (a)(1) In this section, "disability" means:
>
> (i)    A physical or mental impairment that substantially limits one or more of an individual's major life activities;
>
> (ii)    A record of having a physical or mental impairment that substantially limits one or more of an individual's major life activities; or
>
> (iii)    Being regarded as having a physical or mental impairment that substantially limits one or more of an individual's major life activities.

CJ § 3-819.2(a)(1). The statute also provides that a disability of a potential custodian or guardian are relevant to the limited extent that "the disability affects the best interest of the child." CJ § 3-819.2(g). Accordingly, D.L. likely faces possible collateral consequences

with respect to future child custody or CINA determinations. In sum, her involuntary admission would likely be referenced in the local department's report on her suitability as a parent. CJ § 3-819.2(f)(1)(iii). The mental illness upon which her involuntary admission is based and the admission itself may become relevant if characterized as a disability under CJ § 3-819.2(g). Although the record does not reflect that D.L is a parent at this time, our jurisprudence requires only the possibility of collateral consequences. Such a possibility exists here. Moreover, this underscores the importance of the circuit court developing a full record and hearing testimony on these relevant factors. Such inquiry will only illuminate the areas in which collateral consequences may or may not exist for a particular individual.

Fourth, D.L. points out that the Application for Naturalization ("Form N-400") provided by the Department of Homeland Security's U.S. Citizenship and Immigration services requires disclosure of whether an individual has previously been admitted to a facility. The N-400 form requires applications to disclose if they have "EVER been declared legally incompetent or been confined to a mental institution?" Dept. of Homeland Security, U.S. Citizenship and Immigration Services, Form N-400, "Application for Naturalization," at 11, available at https://www.uscis.gov/n-400 (https://perma.cc/UAF9-DFDX)(last visited Aug. 12, 2019).

Sheppard Pratt responds by arguing that the record does not reflect that D.L. is not a U.S. citizen and therefore this alleged collateral consequence is conjectural. Before this

29

Court, D.L. conceded that she is a United States citizen.[8]  Based on D.L.'s concession, she will not face any possible collateral consequences concerning her immigration status. However, we note analysis concerning the existence of collateral consequences within this context is heavily fact dependent.  While the possibility of collateral consequences concerning immigration status could likely be an issue in future cases, based on the record before us, we are not convinced that this concern is implicated in the instant appeal.

Fifth, D.L. argues that, as a consequence of her involuntary admission at Sheppard Pratt, she will be precluded from serving on a federal jury.  28 U.S.C. § 1865(b)(4) provides that an individual is eligible to serve on federal juries unless he or she "is incapable, by reason of mental or physical infirmity, to render satisfactory jury service[.]"  As a preliminary issue, we must note that due to D.L.'s age she is currently unable to serve on a federal jury.  However, this provision does not indicate that an individual will be barred from serving on a federal jury based on a historical involuntary admission.  Instead, the provision indicates that if an individual is affected by mental illness, to the extent that he or she is unable to perform satisfactorily on a jury, then he or she is excluded from participating in jury service.  *Id.*

The record before us presents insufficient evidence to conclude that, when D.L. reaches the age of majority and is therefore eligible to serve on a federal jury, she will be unable to perform satisfactorily as a juror simply based on an involuntary admission to

---

[8] D.L. made this concession in her brief before this Court.  Nonetheless, information concerning D.L.'s citizenship is not contained within the record, which underscores the importance of establishing a detailed record in the courts below.

Sheppard Pratt. Moreover, the statute is devoid of any indication that any such determination regarding jury eligibility will be based on admissions to mental health facilities. Therefore, this alleged collateral consequence is inherently conjectural falling below the "possibility" threshold elucidated in *Adkins*. 324 Md. at 654 (citing *Morgan*, 346 U.S. at 512—13 and *Pollard*, 352 U.S. at 358).

Sixth, D.L. contends that she will suffer from collateral consequences within the context of any future proceedings for involuntary admission. To support her position, D.L. relies on this Court's decision in *Adkins*, 324 Md. 641 (1991). In *Adkins*, we held that an appeal taken from an order revoking a defendant's probation that also had the effect of re-imposing a portion of a previously suspended sentence was not moot because of the potential collateral consequences stemming from that order. 324 Md. at 656. There, the defendant completed his sentence before he could appeal the order revoking probation. *Id.* at 642—43. The Court concluded that there were collateral consequences which would prevent the appeal from being moot. *Id.* at 656. Ultimately, the primary collateral consequence of the order revoking Mr. Adkins' probation was that the order may be relevant to and affect future criminal proceedings. *Id.* at 654. Specifically, Mr. Adkins argued that if he were subsequently arrested and convicted of a crime, the order revoking his probation would become relevant with respect to future sentencing, parole qualification, and time served credits. *Id.* at 644—46.

D.L. first attempts to analogize this case to *Adkins* by contending that if prior violations of probations may be considered within future criminal prosecution, then prior involuntary admissions may be considered at future involuntary admission proceedings as

well. In support of her position, she urges this Court to examine several holdings of North Carolina and Washington courts. Particularly, she draws our attention to a decision of the Supreme Court of North Carolina, *see In re Hatley*, 231 S.E. 2d 633 (N.C. 1977), and the Court of Appeals of Washington, District Two. *See In re M.K.*, 168 Wash. App. 621, 626 (2012). In contrast, Sheppard Pratt argues that Maryland's statutory framework regulating involuntary admissions does not contemplate prior involuntary admissions and any involuntary admission decision is primarily based on the patient's mental health at the time of the hearing.

In *In re Hatley*, the court held that an appeal stemming from a patient's involuntary admission, where the patient was released prior to judicial review, was not moot because of the associated potential collateral consequences. The *Hatley* court determined that any orders requiring involuntary admission would become relevant in future involuntary admission proceedings. *Id.* at 635. The court commented, "[m]ost significantly, records of commitments to a mental institution will certainly be used in any subsequent proceedings for civil commitment[.]" *Id.* at 635 (quoting *In re Ballay*, 482 F.2d 648, 652 (D.C. Cir. 1973)).

In addition to *Hatley*, D.L. cites to a decision by the Court of Appeals of Washington, District Two, for the proposition that cases involving involuntary admission are not rendered moot by an individual's release because of the collateral consequences associated with involuntary admission. Therein, the court commented that "[a]n individual's release from detention does not render an appeal moot where collateral consequences flow from the determination authorizing such detention." *In re M.K.*, 168

32

Wash. App. at 626. The foremost collateral consequence identified by the court was the potential that a record of the involuntary admission would be used in any subsequent involuntary admission proceeding:

> In the case of civil commitments . . . the trial court is directed to consider, in part, a history of recent prior civil commitments, thus, each order of commitment entered up to three years before the current commitment hearing becomes a part of the evidence against a person seeking denial of a petition for commitment.

*Id.* at 626. Therefore, we must review Maryland's statutory framework regulating involuntary admissions to determine whether, as Sheppard Pratt contends, that reference to any prior involuntary admissions are prohibited and may not be considered by an ALJ within involuntary admission proceedings.

The first step within any involuntary admission is a certificate for admission created by a medical professional who examined the patient, diagnosed the patient with a psychological disorder, and opined that the individual requires in-patient psychological treatment. HG § 10-616(a). Such certificates are limited temporally and may not be used if the examination referenced in the certificate was performed more than one week prior to the physician signing the certificate or "[m]ore than 30 days before the facility. . . receives the application for admission." HG § 10-616(b). Additionally, Sheppard Pratt contends that HG § 10-632(e) limits an ALJ's admission decision to the patient's mental health at the time of a potential involuntary admission. The provision, in pertinent part, provides the following:

> [An ALJ shall order] the release of the individual from the facility unless the record demonstrates by clear and convincing evidence that at the time of the

33

hearing each of the following elements exist as to the individual whose involuntary admission is sought:

(i)    The individual has a mental disorder;

(ii)   The individual needs in-patient care or treatment;

(iii)  The individual presents a danger to the life or safety of the individual or of others;

(iv)   The individual is unable or unwilling to be voluntarily admitted to the facility;

(v)    There is no available less restrictive form of intervention that is consistent with the welfare and safety of the individual[.]

HG § 10-632(e)(2).

Based on our review of Maryland's statutory framework concerning involuntary admission and the record as a whole, we find Sheppard Pratt's arguments on this point unconvincing. Although involuntary admission is based on an admission certificate that is temporally limited and the hearing judge's determination is based on an individual's mental health and behavior at the time of the hearing, there is no outright prohibition against an ALJ considering an individual's past mental health history. Such mental health history would ultimately encompass any prior involuntary admissions. In fact, Sheppard Pratt's substantial reliance on HG § 10-632(e) is unwarranted because the provision does not forbid a hearing judge from considering prior incidents of mental health or prior instances of psychiatric treatment.

In addition, out of practical concerns, Sheppard Pratt's position becomes less persuasive when one considers how D.L.'s prior stay at Mann RTC made its way into the record. During the hearing, Dr. Seidel testified that "we are trying to place her back at

34

[Mann RTC] at the Sheppard Pratt Towson campus where she has been before" and "[s]he's been at [Mann RTC], she doesn't want to go back[.]" As evident, there is no outright prohibition against introducing evidence or commenting that an individual had previously stayed at an RTC or been admitted to a mental health facility. We find Sheppard Pratt's contrary contentions unavailing.

Sixth, D.L. argues that she will face additional collateral consequences stemming from her involuntary admission based on the social stigmatization of mental illness. This Court has previously recognized the "stigma that often attaches, however unreasonably, to a person with a mental disease[.]" *State v. Marsh*, 337 Md. 528, 536 (1995) (quoting *Treece v. State*, 313 Md. 665, 677 (1988)). The Supreme Court has also commented on the stigma that attaches to involuntary admissions:

> [I]t is indisputable that involuntary commitment to a mental hospital after a finding of probable dangerousness to self or others can engender adverse social consequences to the individual. Whether we label this phenomena "stigma" or choose to call it something else is less important than that we recognize that it can occur and that it can have a very significant impact on the individual.

*Addington v. Texas*, 441 U.S. 418, 425—26 (1979). Several of our sister states have also held that the associated social stigma of an involuntary admission constitutes a collateral consequence which prevents dismissal on mootness grounds. *See In re Joan K.*, 273 P.3d 594, 597 (2012); *Bradshaw v. State*, 210 Idaho 429, 432 (1991); *In re Splett*, 143 Ill. 225, 228-29 (1991); *State v. Lodge*, 608 S.W.2d 910, 912 (1980).

Sheppard Pratt counters that any records concerning involuntary admission of D.L. are substantially protected under the Health Insurance Portability and Accountability Act

35

("HIPAA"). It first argues that any records of a patient's mental health treatment are confidential. 42 U.S.C. § 1320d(6); 45 CFR § 164.502(a). The associated HIPAA provisions also significantly limit external access to protected health information. 45 CFR § 164.502(a) (limiting access to such information to individuals, for treatment or payment of health care operations, with the patient's consent, and other exceptions not relevant to the instant appeal). *See also* 45 CFR § 164.512. HIPAA's protection of patient information is enforceable because entities or business associates that violate provisions of HIPAA are subject to civil monetary penalties. *See* 45 CFR §§ 164.402, 404. Additionally, any non-permitted access to information protected under HIPAA carries criminal penalties. 45 CFR § 2508.18.

In addition to federal informational protections that would limit the dissemination of any records or information concerning an individual's mental health treatment, an individual's medical records are also confidential under Maryland law. HG § 4-302(a). Pursuant to Maryland's system of protecting medical records, violation of any provision concerning the confidentiality of medical records is subject to criminal penalties. *See* HG § 4-309(d) (providing criminal penalties for willful violations of confidentiality); HG § 4-309(e) (providing more substantial criminal penalties to those obtaining medical records through deception); and HG § 4-309(f) (indicating that violators will be liable for actual damages).

Despite these informational protections, it does not amount to an outright ban on dissemination of information concerning an individual's mental health history. For instance, some information concerning D.L.'s prior stay at Mann RTC made its way into

the record without offending these HIPAA protections. Further, these protections do not guarantee that records of an individual's past mental health treatment will be entirely shielded from access. In fact, in the words of the Department of Health and Human Services' guidance materials, HIPAA "support[s] information sharing by providing assurance to the public that sensitive health data would be maintained securely and shared only for appropriate purposes or with express authorization of the individual." HHS.gov, Understanding Some of HIPAA's Permitted Uses and Disclosures, *available at:* https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/permitted-uses/indext.html (https://perma.cc/9WBK-AEQG) (last visited Aug. 12, 2019). Although the informational protections afforded such information at both the State and federal levels may mitigate the dissemination of such information to an extent, they do not constitute an outright ban on disclosure. Accordingly, D.L. faces possible collateral consequences stemming from her involuntary admission based on the social stigmatization of mental illness.

Lastly, D.L. argues that she will be subject to collateral consequences that concern her ability to own, possess, or transfer firearms at both the State or federal levels. First, pursuant to § 5-133.2(c) of the Public Safety Article ("PS"), facilities are required to submit to the Federal Bureau of Investigation's ("FBI") National Instant Criminal Background Check System ("NCIS Index"). Particularly, a facility must submit to the NCIS Index the name and identifying information of the individual admitted, the date of admission, and the name of the facility. PS § 5-133.2(c)(2). This requirement is not unique in its application to those who are involuntarily admitted. The reporting requirement also applies

37

to those who are voluntarily admitted to a facility and stay there for longer than thirty consecutive days. PS § 5-133.2(c)(1)(i). Based on the statute's language, D.L.'s information was transmitted to the FBI for addition to the NCIS index based on her involuntary admission to Sheppard Pratt. Therefore, a possible collateral consequence exists. Furthermore, this requirement is interrelated with potential restrictions on D.L.'s ability to own firearms at the federal level. *See* 2013 Md. Laws ch. 427. Accordingly, we must analyze the potential collateral consequences D.L. may face through potential restrictions on her ability to own or possess firearms.

D.L. contends that, as a consequence of her involuntary admission, she will be precluded from owning or possessing certain firearms under Maryland law. *See* PS § 5-118(b)(3)(xi) (excluding those who are involuntarily admitted to a facility from owning regulated firearms). *See also* PS § 5-205(b)(10) (prohibiting those who are involuntarily admitted from possessing rifles and shotguns). We must first note that, due to D.L.'s age, she is currently unable and will be unable to legally own a firearm for several years. Additionally, although the restrictions of PS § 5-205(b)(10) would ordinarily apply, the form commitment order provides the following paragraph:

> **FURTHERMORE**, I FIND THAT THE INDIVIDUAL CANNOT SAFELY POSSESS A FIREARM BASED UPON CREDIBLE EVIDENCE OF **DANGEROUS TO OTHERS, THEREFORE THE INDIVIDUAL MUST:**
>
> 1. Surrender to law enforcement authorities any firearms in the individual's possession; and
> 2. Refrain from possessing a firearm unless the individual is granted relief from firearms disqualification in accordance with [PS] § 5-133.3

(emphasis in original). However, the ALJ in this case failed to check the corresponding box and sign this paragraph. Therefore, based on the commitment order, D.L. is not subject to restrictions on possessing firearms found in PS § 5-205(b)(10).

Nonetheless the restrictions apply to her ability to own a regulated firearm and her ability to obtain a firearm application is limited. PS § 5-118(b)(3)(xi). *See also* PS § 5-118(b)(3)(vii) (indicating that an individual may not file a firearm application if he or she "suffer[s] from a mental disorder as defined in [HG] § 10-101(i)(2) and ha[s] a history of violent behavior against the firearm applicant or another.").[9] Sheppard Pratt argues that any restrictions on D.L.'s ability to own firearms are sufficiently mitigated by statutory provisions which can potentially allow her to regain this right in the future. In particular, PS § 5-133.3 enables individuals that are prohibited from owning or possessing certain firearms to have this right reinstated. An aggrieved individual may file an application signed by a physician licensed and certified in psychiatry or psychology providing information about the individual's former mental health treatment, the length of the treatment, and whether the applicant would pose a safety risk to themselves or others if allowed to possess a firearm. PS § 5-133.3(d).

The ability for this class of individuals to purchase, possess, or transfer firearms is also limited by federal law. For example, 18 U.S.C. § 922(d)(4) prohibits the sale or transfer of firearms to one who has been adjudicated as mentally defective or one who "has

---

[9] A similar provision exists within PS § 5-205(b)(6), which prohibits an individual from possessing or owning a rifle or shotgun if the individual has a history of violent behavior towards themselves or others.

39

been committed to any mental institution[.]"[10]  However, much like its State counterpart, this federal provision is not unlimited in its scope.  Individuals affected by the provision may file an application with the Attorney General to remove these restrictions.  18 U.S.C. § 925(c).  The Attorney General will grant such applications if, based on the circumstances surrounding the applicant's disability, subsequent record, and reputation demonstrate that the applicant will not "be likely to act in a manner dangerous to public safety and that granting of the relief would not be contrary to the public interest."  *Id.*

Sheppard Pratt argues that these statutory provisions that permit those who have been involuntarily admitted to regain the ability to own or transfer firearms sufficiently mitigate any collateral consequences stemming from D.L.'s involuntary admission.  Nonetheless, as reiterated throughout our discussion, our analysis of collateral consequences focuses on the possibility of collateral consequences.  *Adkins*, 324 Md. at 654.  Although existing possible collateral consequences may be statutorily mitigated to some degree, such an inquiry falls beyond the ambit of our analysis.  Although these mitigating provisions exist, they do not undercut the existence of possible collateral consequences.  Additionally, with respect to the limitations on firearm ownership at the federal level, although applications may be filed with the Attorney General to reinstate an

---

[10] We note that this provision is likely implicated by D.L.'s prior stay at Mann RTC based on the language concerning voluntary admissions.  In short, the record does not adequately reflect the nature of D.L.'s prior stay at Mann RTC, i.e. whether voluntary or involuntary. The interaction between D.L.'s prior stay at Mann RTC and the involuntary commitment undergirding the instant appeal will be discussed in detail shortly hereafter.  *See infra* at 39—43.

40

individual's firearm rights, there is no guarantee that the application will be granted.  Put simply, any mitigating effect these statutory provisions provide is ad hoc and emerges after judicial action has engendered any collateral consequences.

Next, we turn to the distinction between facilities and RTCs to ascertain the extent to which D.L.'s prior stay at Mann RTC would affect our determination regarding the existence of collateral consequences.

This case involves a subsidiary issue that concerns the difference between a "facility" as used in HG § 10-613 and an RTC as defined within HG § 19-301(p).  As noted above, D.L. was admitted to Mann RTC prior to the involuntary admission at issue in the present appeal.  Sheppard Pratt argues that a majority of these collateral consequences from D.L.'s involuntary admission are attributable to her prior stay at Mann RTC.  Primarily, they argue that an RTC meets the statutory definition of a facility and therefore, a majority of the alleged collateral consequences that may limit D.L.'s rights, i.e., owning firearms, employment, and social stigma,[11] were implicated by her prior stay at Mann RTC rather than her involuntary admission to Sheppard Pratt which this appeal centers upon.

---

[11] As noted above, the State statutory provisions restricting a certain individual's rights are primarily based upon an individual's prior admission to a facility.  *See* PS § 5-118(b)(3)(xi) (requiring disclosure of whether an individual has ever been "committed to a facility" for the purpose of applications to own registered firearms); PS § 5-205(b) (prohibiting the possession of firearms for those "involuntary committed to a facility[.]").

Additionally, at the federal level, the relevant statutory provisions use the term "mental institutions" rather than facility.  18 U.S.C. 922(d)(4) (prohibiting sale of firearms to individuals that have "been committed to any mental institution[.]").  The regulations concerning employment also utilize the term "mental institution" rather than facility.  *See* COMAR 29.04.01.02.E(6); COMAR 29.04.08.03.C(6).

41

Based on the scant record before us, we cannot confidently determine that sufficient overlap exists between an RTC and a facility. The Court of Special Appeals held that any collateral consequences D.L. may face already existed based on her prior stay at Mann RTC. The court commented that her "stays at the Mann RTC . . . are involuntary commitments because [D.L.] is a minor[,]" and "we hold that the instant involuntary commitment does not generate potential collateral consequences that were not already created by [D.L.]'s prior and subsequent commitments." *D.L. v. Sheppard Pratt Health Sys., Inc.*, No. 2023, Sept. Term, 2016, 2018 WL 896905, at *8 (Md. Ct. Spec. App. Feb. 12, 2018). However, during the hearing before the circuit court, when discussing whether an RTC constitutes a less restrictive form of intervention, counsel for Sheppard Pratt testified that "a residential treatment center, which is yes, considered a less-restrictive environment to the extent that there's no involuntary admission process."

After concluding that her stay at Mann RTC was an involuntary admission, which stands in opposition to testimony adduced at the hearing in the courts below, the Court of Special Appeals determined that a majority of the alleged collateral consequences may be attributed to D.L.'s stay at Mann RTC and therefore cannot flow from D.L.'s involuntary admission at Sheppard Pratt. In particular, based on its determination that D.L.'s prior stay at Mann RTC was an involuntary commitment, the court concluded that the following statutory restrictions had already been implicated: (i) FBI NCIS reporting; (ii) Maryland restrictions to firearms ownership;[12] (iii) State driving privileges; (iv) governmental

---

[12] PS § 5-118(b)(3)(xi) (prohibiting those who have been involuntarily committed to a facility from acquiring a firearm application); PS § 5-205(b)(10) (prohibiting possession

42

employment; and (v) the social stigmatization of mental illness. Before this Court, Sheppard Pratt echoes the analysis of our intermediate appellate court, arguing that D.L.'s prior stay in Mann RTC implicates the above mentioned collateral consequences.

The Health-General Article defines an RTC as "a psychiatric institution that provides campus-based intensive and extensive evaluation and treatment of children and adolescents with severe and chronic emotional disturbances who require a self-contained therapeutic, educational, and recreational program in a residential setting." HG § 19-301(p). In contrast, HG § 10-101(g)(1) provides that the term "'facility' means any public or private clinic, hospital, or other institution that provides or purports to provide treatment or other services for individuals who have mental disorders." HG § 10-101(g)(1).

Despite Sheppard Pratt's contentions that D.L.'s earlier stay at Mann RTC was an admission—either voluntary or involuntary, juveniles are not always necessarily placed at RTCs based on admissions and the record before us does not adequately reflect the underlying situation which compelled D.L.'s stay at Mann RTC. Instead, a juvenile may be placed at an RTC based on interaction with the criminal justice system. *See generally* CJ § 3-8a-15. In fact, the Maryland Department of Juvenile Services explains the

---

or ownership of a rifle or shotgun where the owner has previously been involuntarily admitted to a facility); PS § 5-133(b)(10) (prohibiting the possession of regulated firearms where an individual has been involuntarily committed). All of these statutory provisions reference HG § 10-101 for the definition of a facility.

The federal restrictions on an individual's ability to transfer firearms is broader than those at the State level and does not require an individual be involuntarily admitted. Instead, the provision excludes those from transferring firearms if he or she "has been adjudicated as a mental defective or has been committed to any mental institution[.]" 18 U.S.C. § 922(d)(4).

43

procedure through which a juvenile found involved, in what would otherwise constitute criminal conduct, may end up at an RTC:

> The juvenile court may commit a youth to the care of DJS. Legal custody of the youth is thereby transferred to the Department. A range of out-of-home program options (or placements) have been developed for committed youth. Community-based program options include placement in a foster home, group home, or independent living program. Placements in non-community settings include Intermediate Care Facilities for Addictions (ICFA), Residential Treatment Centers (RTC), DJS-operated Youth Centers, and secure confinement facilities. DJS operates seven facilities in Maryland and contracts with others both in-state and out-of-state.

2018 Data Resource Guide, Section IV: Committed Programs, Maryland Department of Juvenile Services at 144, *available at*: https://djs.maryland.gov/Documents/DRG/Data_Resource_Guide_FY2018_full_book.pdf (https://perma.cc/ST98-VEUJ)(last visited Aug. 12, 2019).

In addition, other sources confirm that a juvenile may be placed in an RTC based on involvement with the juvenile criminal system:

> Less than 1% of children in DHR out-of-homecare are placed in the State's most restrictive placements (hospitalizations), while an average of 4% are in non-community-based placements (Residential Treatment Centers, Correctional Institutions, or Secure Detention (Table 21)). Both of these placement categories are necessitated by severe mental health and medical needs, **and/or involvement in the juvenile/adult criminal justice system**; these placements are primarily driven by the behavioral needs of the child rather than the family's inability to provide a safe environment, although past abuse and trauma may contribute to individual children's mental health issues and/or criminal acting-out behaviors.

State of Maryland Out-Of-Home Placement and Family Preservation Resource Plan 2013, the Governor's Office for Children, *available at:* http://dlslibrary.state.md.us/publications/JCR/2013/2013_14.pdf (https://perma.cc/G72N-

44

BX75) (last visited Aug. 12, 2019) (emphasis added). Prior Maryland cases confirm this interpretation. *See Long v. Maryland State Dep't of Pub. Safety and Corr. Servs.*, 230 Md. App. 1, 18 (2016); *In re Nick H.*, 224 Md. App. 668, 672 (2015); *In re William G.*, 52 Md. App. 131, 132 (1982); *In re Glenn H.*, 43 Md. App. 510, 513 (1979).

Put simply, although there may be a slight overlap between the definitions of an RTC and a facility within the Health-General Article, based on the record before us, we lack the requisite clarity to determine that D.L.'s prior stay at Mann RTC was actually an admission. As we have demonstrated, juveniles are occasionally placed in RTCs as a result of interaction with the criminal justice system. The record does not provide sufficient detail from which we can conclude that D.L.'s prior stay at Mann RTC was an involuntary admission as represented by Sheppard Pratt. Therefore, because there was no hearing on the merits in the circuit court, we determine that the record is insufficient to prove that the collateral consequences were implicated by D.L.'s earlier stay at Mann RTC.

Accordingly, we hold that D.L. faces possible collateral consequences stemming from her involuntary admission. Although some of these possible collateral consequences may be implicated by an individual's earlier voluntary or involuntary admission, the record before us is sparse and does not indicate whether D.L.'s prior stay at Mann RTC was an involuntary admission. Because D.L. faces collateral consequences from her involuntary admission, we need not analyze the several exceptions to the mootness doctrine or whether D.L. preserved the capable of repetition yet evading review exceptions for our review. We remand to the circuit court to analyze the substantive issues within D.L.'s petition for judicial review, i.e. whether an available less restrictive form of intervention existed.

45

Overall, we must note that analysis of whether an individual faces collateral consequences as a result of an involuntary admission is heavily fact dependent and the existence of such collateral consequences may vary dependent upon the facts of a particular case.

## CONCLUSION

D.L. faces collateral consequences as a result of her involuntary admission. As we have determined that D.L. is subject to several collateral consequences stemming from her involuntary admission, the instant appeal is not moot and the circuit court erred by dismissing D.L.'s petition for judicial review as moot based simply on her release from Sheppard Pratt.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED AND CASE REMANDED TO THAT COURT FOR REVERSAL OF THE JUDGMENT BY THE CIRCUIT COURT FOR HOWARD COUNTY AND REMAND TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY RESPONDENT.**

46