*In re: K.K.*, Nos. 129 & 130, September Term, 2024. Opinion by Harrell, J. Filed June 27, 2025.

**JUVENILE LAW – DELINQUENCY – DISPOSITION – MODIFICATION OF DISPOSITION**

**JUVENILE LAW – DELINQUENCY – PROBATION – VIOLATION OF PROBATION**

The Juvenile Justice Reform Act prohibits committing a child to the Department of Juvenile Services for out-of-home placement if "the most serious offense" is a misdemeanor not involving a firearm or a technical violation of probation. Appellant, while on juvenile probation for a misdemeanor not involving a firearm, committed a non-technical violation of his probation and was committed to the Department of Juvenile Services for out-of-home placement. Although the statutory text is ambiguous, the legislative history makes clear that the General Assembly intended for the juvenile courts' array of disposition options to be confined by the underlying delinquent act. Accordingly, the Appellate Court of Maryland reversed, holding that, where out-of-home placement was not an available disposition for the underlying delinquent act, it does not become available after finding that the child has committed a non-technical violation of probation.

Circuit Court for Frederick County
Case Nos.: C-10-JV-23-000038
        & C-10-JV-23-000086

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

Nos. 129 & 130

September Term, 2024

_____

IN RE: K.K.

_____

Arthur,
Tang,
Harrell, Glenn T., Jr.
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Harrell, J.

_____

Filed: June 27, 2025

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

In 2022, the General Assembly enacted the Juvenile Justice Reform Act ("JJRA") with the aim of overhauling the way Maryland's justice system treats children. Among the myriad reforms embodied in the statute, a child could no longer be committed to the Department of Juvenile Services ("DJS") for out-of-home placement if he/she commits a misdemeanor (not involving a firearm) or a technical violation of their probation. Md. Code Ann., Cts. & Jud. Proc. ("CJP") § 3-8A-19(d)(3). If a child commits a non-technical probation violation, a court may restart his/her term of probation. CJP § 3-8A-19.6(f). This case considers in what other ways a court may address a non-technical violation of probation.

While on probation for misdemeanor assault, Appellant K.K., a minor, got into a fight at school. Although he was found, beyond a reasonable doubt, not involved, the Circuit Court for Frederick County, sitting as a juvenile court, found, by a preponderance of the evidence, that K.K. committed assault—a non-technical violation of his probation. As a result, the State asked the court to commit K.K. to DJS for out-of-home placement. K.K. responded that, under the JJRA, he could not be placed out-of-home because his original delinquent act was a misdemeanor not involving a firearm. The juvenile court disagreed, concluding that K.K.'s "most serious offense" (as described in the JJRA) was the non-technical violation of probation, and committed him to DJS. K.K. noted this appeal, but has been released since from DJS.

On appeal, K.K. presents one question for our consideration:

> Did the juvenile court err in committing K.K. to an out-of-home placement for a non-technical violation of

probation, where the offenses for which he was on probation were misdemeanor offenses not involving a firearm?

Because K.K.'s commitment to DJS ended while this case was on appeal, we conclude that the matter is moot. Even so, we exercise our discretion to address his question because it concerns a matter of public importance that is capable of repetition, yet evading appellate review. The statutory text does not address clearly whether a juvenile court may place a child out-of-home for a subsequent non-technical violation of probation, where it could not have done so for the original delinquent act. The linchpin of the resolution of this case is the legislative history of the JJRA, which reveals that the General Assembly did not intend for the prohibition on out-of-home placement to evaporate once the initial disposition was made. Thus, for the reasons elaborated below, we shall reverse the juvenile court's judgment.

## BACKGROUND

When K.K. was thirteen years old, he admitted to two counts of misdemeanor second-degree assault. As a consequence, in August 2023, he was placed on six months of supervised probation with several conditions, including that he obey all laws. While on probation, K.K.—then fourteen years old—was found "facts-sustained" and delinquent of another misdemeanor second-degree assault.[1] He was placed again on six months of

---

[1] As a result of the facts-sustained finding, K.K. consented to an extension of the community detention condition of his initial term of probation.

probation with largely the same conditions as the initial term of probation. Neither case involved a firearm.[2]

Within two months, K.K.—now fifteen years old—got into a fight with another student at school in a dispute concerning a vape pen. He was arrested and charged with robbery, second-degree assault, and false imprisonment, leading to a third delinquency petition. The State moved also to initiate violation-of-probation proceedings in K.K.'s prior cases, listing several technical violations and the non-technical violation of failing to obey all laws. The State requested that the court revoke K.K.'s probation.

In January 2024, the court held an adjudicatory hearing in K.K.'s third case. At the close of the State's case-in-chief, it dismissed the false-imprisonment charge. The court acquitted K.K. of robbery. As to the assault charge, the court, under a mutual-affray theory, found K.K. not involved beyond a reasonable doubt, concluding that it was "reasonable" for K.K. to believe that the victim invited him to fight. The court noted, however, "that had this been a situation where the standard of proof was preponderance of the evidence, [it] wouldn't have any problem finding [K.K.] [involved.]"

The court pivoted then to the violation-of-probation proceedings. At the State's request, the court took judicial notice of the evidence it had just heard and found, by a preponderance of the evidence, that K.K. committed a second-degree assault, which violated his probation. The State chose not to present evidence as to the alleged technical violations. The State intended to ask the court to commit K.K. to DJS. K.K. argued,

---

[2] Both cases involved a BB gun, which is not a firearm under Maryland law. *See generally* Md. Code Ann., Public Safety § 5-101(h) (defining "firearm").

however, that, under CJP § 3-8A-19(d)(3)(i), "when the maximum penalty at the outset of the case was only a community-based probation[,] . . . if you violate that probation, you can't be then subject to a higher penalty on the violation[.]" The court deferred final ruling on the matter and set another hearing so that the parties could brief and argue that issue.

In the end, the juvenile court rejected K.K.'s argument. It concluded that, because K.K.'s "most serious offense"— interpreting CJP § 3-8A-19(d)(3)(i)'s usage of that term— was a non-technical violation of probation, he was "eligible" for out-of-home placement. After hearing further argument from the parties about the best course of action, the court committed K.K. to DJS for out-of-home placement. This appeal followed.[3]

### MOTION TO DISMISS

The juvenile court committed K.K. to DJS on 11 March 2024. On 1 October 2024, after he filed with this Court his principal brief, K.K. notified us that he had been released from out-of-home placement. Consequently, the State, in its responsive brief, moved to dismiss these appeals as moot. K.K. counters that the cases are not moot because he may suffer still collateral consequences from his commitment to DJS. Alternatively, he asks, even if the appeals are moot technically, that we exercise our discretion to address the merits of the appeals.

"Generally, a case is moot if no controversy exists between the parties or when the court can no longer fashion an effective remedy." *D.L. v. Sheppard Pratt Health Sys., Inc.*, 465 Md. 339, 351–52 (2019) (cleaned up). Our appellate courts are reluctant to hear and

---

[3] The Court granted K.K.'s unopposed motion to consolidate his appeals on 23 August 2024.

4

decide the merits of moot cases because we do not offer advisory opinions. *Id.* at 352. Even so, some cases are moot ostensibly, yet receive appellate review because there may be collateral consequences from the decision. *Id.* Other cases, although moot definitively, may warrant appellate review under an exception to the mootness doctrine. *Id.*

### I. Collateral Consequences

A case is not moot if "a party can demonstrate that collateral consequences flow from the lower court's disposition." *Id.* (citing *Adkins v. State*, 324 Md. 641, 645–46 (1991)). For example, "[w]here there are no direct consequences, 'a criminal case is moot only if it is shown that there is no possibility that any collateral legal consequences will be imposed on the basis of the challenged conviction.'" *Adkins*, 324 Md. at 647 (quoting *Sibron v. New York*, 392 U.S. 40, 57 (1968)). The "collateral consequences need not be concrete and actual; instead, a[n] [appellant] must demonstrate only the possibility of collateral legal consequences to preclude a finding of mootness." *D.L.*, 465 Md. at 357 (cleaned up). That said, ever since the United States Supreme Court's decision in *Lane v. Williams*, 455 U.S. 624 (1982), courts applying the collateral consequences doctrine draw a distinction between appeals challenging a court's determination or finding—e.g., a conviction—and those challenging only a direct consequence of that determination or finding—e.g., a sentence.

In *Lane*, the defendants pleaded guilty to burglary. They were sentenced to a term of imprisonment. 455 U.S. at 625. At the time, burglary carried a mandatory three-year parole term. *Id.* Neither defendant in *Lane* was informed of the mandatory parole term before entering their plea. *Id.* at 626. Both defendants completed their sentences, were

5

released, and were later reincarcerated as parole violators. *Id.* at 626–27. Each petitioned for a writ of habeas corpus seeking their immediate release. *Id.* at 627–28. By the time the case reached the Supreme Court, however, both were released from custody. *Id.*

The Court held that, "[s]ince [the defendants] elected only to attack their sentences, and since those sentences expired during the course of these proceedings, th[e] case [wa]s moot." *Id.* at 631. It observed that the case would not have been moot had the defendants attacked their convictions or sought specific performance of the plea agreement as they understood it. *Id.* at 630. Because, during the pendency of the appeal, the only consequence from which they sought relief expired, there was nothing more the Court could do. *Id.* at 630–31. "Through the mere passage of time, [the defendants] ha[d] obtained all the relief that they sought." *Id.* at 633. Thus, there was not a live controversy. *Id.*

The Supreme Court of Maryland, in *Adkins*, analyzed *Lane* in the context of a violation of probation and found it distinguishable factually. Unlike *Lane*, Adkins, "facing a term of imprisonment of eight years upon violation and revocation of his probation," denied the charged violations. *Adkins*, 324 Md. at 650. Also unlike *Lane*, he chose to contest any probation violation adjudication on procedural due process grounds. *Id.* at 650–51. The Court noted that

> [a] successful due process challenge . . . would remove from [Adkins's] record any blemish of a violation of probation finding. On the other hand, if he [wa]s unsuccessful, that finding would remain and, more importantly, have a negative effect on subsequent proceedings, should [Adkins] again get into trouble with the law. In other words, it would have collateral consequences.

*Id.* at 651.

6

The Court emphasized that it was the finding that Adkins had violated his probation, rather than the direct consequence of serving his sentence, that would have collateral legal consequences. *Id.* at 654. "Just as the conviction for the underlying offense can be considered in connection with sentencing for a subsequent conviction, so, too, . . . can the finding of violation of probation." *Id.* Thus, the Court concluded the appeal was not moot. *Id.* at 656.

In *D.L.*, Maryland's Supreme Court applied the doctrine in another context. There, the appellant was admitted involuntarily to a psychiatric facility. *D.L.*, 465 Md. at 341. After she was released, she petitioned for judicial review, challenging her involuntary admission. *Id.* The circuit court dismissed her petition as moot due to her release from the facility. *Id.* The Supreme Court reversed, holding that there were many collateral consequences that followed from an involuntary commitment, which kept the case alive. *Id.* at 381.

K.K. likens his situation to the appellant in *D.L.*, contending that he will suffer collateral consequences from his commitment to DJS. Although perhaps apt, that is not the focus of a proper analysis. The common thread throughout the cases applying the collateral consequences doctrine is that an appeal challenging only a direct consequence is moot if the appellant is suffering no longer that repercussion. At bottom, the appellant in *D.L.* sought to challenge the administrative law judge's determination that she should be committed, not the commitment itself. *Id.* at 351. K.K., on the other hand, does not challenge the juvenile court's finding that he violated his probation. He attacks only the direct consequence—the court's decision to commit him to DJS. To be sure, he asserts that

7

the court lacked the legal authority to choose that particular consequence, but he does not claim that the court could not impose *any* consequence. *Cf. Adkins*, 324 Md. at 650 ("By presenting a due process challenge based upon inordinate delay, petitioner challenged not simply the sentence he ultimately received, but, as well, the propriety of there being any violation of probation proceeding at all.").

This appeal, at its core, is more akin to an attack on an illegal sentence or the denial of a habeas petition, both of which become moot upon expiration of the challenged direct consequence. *See Lane*, 455 U.S. at 632–63; *Barnes v. State*, 423 Md. 75, 86 (2011). Because K.K.'s commitment to DJS expired, this appeal is moot.

### *II. Mootness Exceptions*

Mootness does not require always dismissal. Rather, "[t]he decision to dismiss a case for mootness is discretionary." *In re S.F.*, 477 Md. 296, 318 (2022) (citing Md. Rule 8-602(c)). "We have the constitutional authority to express our views on the merits of a moot case in instances where the urgency of establishing a rule of future conduct in matters of important public concern is imperative and manifest." *Id.* (cleaned up). Similarly, we may exercise our discretion to address a moot appeal if it presents an issue that is "capable of repetition, yet evading review." *Trusted Sci. & Tech., Inc. v. Evancich*, 262 Md. App. 621, 641 (2024) (cleaned up).

As explained by our Supreme Court in *Powell v. Maryland Department of Health*, 455 Md. 520, 541 (2017):

> This exception applies when "(1) the challenged action was too short in its duration to be fully litigated prior to its cessation or expiration; and (2) there was a reasonable expectation that the

8

same complaining party would be subjected to the same action again." [*State v. Parker*, 334 Md. 576, 585–86 (1994)]. Even if it is unlikely that the same party will be subject to the same action, the exception may also apply if the issue is of public importance and affects an identifiable group for whom the complaining party is an appropriate surrogate (even if a class action is not certified). *See La Valle v. La Valle*, 432 Md. 343, 351–52 (2013)[.]

In *In re S.F.*, the Supreme Court of Maryland chose to address a moot issue in a juvenile delinquency case involving a no-suspension probation condition. 477 Md. at 319–23. The Court reasoned that the issue would "likely reoccur, involve the same parties within the juvenile justice system . . . , likely evade judicial review, and concern[ed] a matter of public interest[.]" *Id.* at 319. The Court observed that not being suspended from school was a "standard" condition of juvenile probation. *Id.* at 320 (quoting Paul J. Hirschfield, *The Role of Schools in Sustaining Juvenile Justice System Inequality*, 28 Future of Children 11, 19 (2018)). The Court noted also that, given the standard timeline for appeals,[4] "it [wa]s likely that many no-suspension conditions for probations w[ould] evade review." *Id.* at 321. The Court concluded that the issue concerned a matter of public importance: the combined, ongoing efforts by the General Assembly and the Maryland Judiciary "to eliminate discrimination on the basis of race, background, or identity in the administration of justice." *Id.* at 321–23.

Similar to the no-suspension conditions at issue in *In re S.F.*, whether a child may be placed out-of-home for a non-technical violation of a misdemeanor probation is an issue

---

[4] It was more than two years after a juvenile magistrate recommended the no-suspension condition of probation that the Supreme Court granted certiorari. *In re S.F.*, 477 Md. at 321 n.13.

that will reoccur likely, involve the same parties within the juvenile justice system, evade likely judicial review, and concerns a matter of public interest. At any given time, there are more than 1,600 children on probation in Maryland, although data from DJS does not distinguish between those on probation for misdemeanors and those on probation for felonies. Dep't of Juv. Servs., *Data Resource Guide, Fiscal Year 2024*, at 18 (Dec. 2024) ("*DJS Data Resource Guide*").[5] Obeying all laws is a standard condition of probation. *See Maddox v. State*, 249 Md. App. 441, 447 (2021). Although the parties did not supply the exact number of juveniles in Maryland who have been placed out-of-home for non-technical violations of misdemeanor probations, these figures suggest the issue is likely to reoccur.[6]

We reject the State's argument that "[t]here is no reason to believe that the issue will evade review" because "this appeal was pending and non-moot for over six months[.]" The average length of stay for a juvenile out-of-home placement with DJS is 160.9 days—roughly five months. *DJS Data Resource Guide* at 138. Given the realities of appellate

---

[5] Available at https://djs.maryland.gov/Documents/DRG/Data_Resource_Guide_FY2024.pdf (last accessed 29 May 2025).

[6] Data from DJS suggests that, in Fiscal Year 2023, sixty-seven children were committed to DJS because of a violation of probation, but there is no distinction between the underlying delinquent act—i.e., misdemeanor or felony. *DJS Data Resource Guide*, at 21. In any event, at least two other cases presenting this same issue were appealed to this Court: *In re S.K.*, No. 182, Sept. Term, 2024, and *In re T.C.*, No. 1315, Sept. Term, 2024. In both cases, the children were released before briefing was completed. The appeals were dismissed voluntarily before this Court could address the merits.

10

litigation,[7] the odds that a child's term of out-of-home placement will have ended by the time the appeal is heard by an appellate court are nearly certain. Thus, it is likely that many out-of-home placements will evade review.

This issue also concerns a matter of public importance. Amid ongoing efforts to reform the juvenile justice system, this case could assist juvenile courts in addressing non-technical violations of misdemeanor probation. Accordingly, we decline to dismiss these appeals for mootness.

## STANDARD OF REVIEW

Statutory interpretation is a question of law. *In re S.K.*, 466 Md. 31, 42 (2019). We therefore "review the juvenile court's decision without deference, *i.e.*, *de novo*." *In re M.P.*, 487 Md. 53, 84 (2024).

## DISCUSSION

### I. Principles of Statutory Interpretation

The goal of statutory construction is "to ascertain and effectuate the real and actual intent of the Legislature." *State v. Weems*, 429 Md. 329, 337 (2012) (cleaned up). "We assume that the legislature's intent is expressed in the statutory language[.]" *Phillips v.*

---

[7] A juvenile court has sixty days after the filing of a notice of appeal to transmit the record to this Court. *See* Md. Rule 8-412(a). The appellant's principal brief is due forty days later. Md. Rule 8-412(c). Assuming neither party stipulates to, nor requests any extension of time, the State's principal brief is due thirty days after the appellant's brief, with any reply brief due twenty days after that. *See* Md. Rule 8-502. For an average out-of-home placement, that would leave just 10.9 days for the Court to issue an opinion, without the benefit of oral argument, deciding a novel issue of law. Even if the stars aligned to create this scenario, it would be a Herculean labor for all involved to resolve the case before it became moot.

11

*State*, 451 Md. 180, 196 (2017). Thus, all statutory interpretation starts with the text, "and ordinary, popular understanding of the English language dictates interpretation of its terminology." *Schreyer v. Chaplain*, 416 Md. 94, 101 (2010) (cleaned up). We do not read the text in isolation, however, instead "viewing it within the context of the statutory scheme to which it belongs." *Bethesda Afr. Cemetery Coal. v. Hous. Opportunities Comm'n of Montgomery Cnty.*, 489 Md. 1, 62 (2024) (cleaned up).

"Our review is holistic, 'seeking to give effect to all of what the General Assembly included and not to add anything that the General Assembly omitted.'" *Id.* (quoting *Westminster Mgmt., LLC v. Smith*, 486 Md. 616, 644 (2024)). In other words, we "take the [statutory] language as we find it, neither adding to nor deleting from it; we avoid forced or subtle interpretations; and we avoid constructions that would negate portions of the language or render them meaningless." *Westminster Mgmt.*, 486 Md. at 644 (cleaned up). "Presuming the General Assembly intends its enactments to operate together as a consistent and harmonious body of law, we also seek to reconcile and harmonize the parts of a statute, to the extent possible consistent with the statute's object and scope." *Id.* at 644–45 (cleaned up).

The first step of our analysis is "determin[ing] whether the statute is ambiguous." *Id.* at 645. A statute is ambiguous if it is "subject to more than one reasonable interpretation[.]" *Turenne v. State*, 488 Md. 239, 285 (2024) (quoting *Buarque de Macedo v. Auto. Ins. Co. of Hartford, Conn.*, 480 Md. 200, 216 (2022)). Even when "words are clear and unambiguous when viewed in isolation," they may "become ambiguous when read as part of a larger statutory scheme." *Westminster Mgmt.*, 486 Md. at 645 (cleaned

12

up). Generally, if the text is plain and unambiguous, our analysis ends, and we apply the statute as written. *Williams v. Morgan State Univ.*, 484 Md. 534, 546 (2023).

On the other hand, if the statute is ambiguous, we seek to "resolve the ambiguity by searching for legislative intent in other indicia, including the history of the legislation or other relevant sources intrinsic and extrinsic to the legislative process." *Bennett v. Harford Cnty.*, 485 Md. 461, 486 (2023) (quoting *Comptroller of Md. v. FC-GEN Operations Invs. LLC*, 482 Md. 343, 380 (2022)). Such sources include "the derivation of the statute, comments and explanations regarding it by authoritative sources during the legislative process, and amendments proposed or added to it." *Boffen v. State*, 372 Md. 724, 737 (2003) (cleaned up) (quoting *Goldberg v. Miller*, 371 Md. 591, 602 (2002)).

This case involves the Juvenile Causes Act, which carries with it the additional mandate that it "shall be liberally construed to effectuate [its enumerated] purposes." CJP 3-8A-02(b). These purposes include, among other things:

> (1) To ensure that the Juvenile Justice System balances the following objectives for children who have committed delinquent acts:
>
>     (i)     Public safety and the protection of the community;
>
>     (ii)    Accountability of the child to the victim and the community for offenses committed; and
>
>     (iii)   Competency and character development to assist children in becoming responsible and productive members of society;
>
> * * *
>
> (4) To provide for the care, protection, and wholesome mental and physical development of children coming within the provisions of this subtitle; and to provide for a program of

13

treatment, training, and rehabilitation consistent with the child's best interests and the protection of the public interest;

(5) To conserve and strengthen the child's family ties and to separate a child from his parents only when necessary for his welfare or in the interest of public safety[.]

CJP § 3-8A-02(a).

Finally, regardless of clarity, every "statute must be given a reasonable interpretation, not one that is absurd, illogical, or incompatible with common sense." *FC-GEN Operations*, 482 Md. at 380 (cleaned up). To that end, "we check our interpretation against the consequences of alternative readings of the text[.]" *Turenne*, 488 Md. at 286 (cleaned up). If one reading would produce such a result, "we will reject that interpretation in favor of another that does not suffer the same flaw." *Westminster Mgmt.*, 486 Md. at 646; *see also Nationstar Mortg. LLC v. Kemp*, 476 Md. 149, 170 (2021) (explaining that "it is important to consider the consequences of alternative interpretations of the statute, in order to avoid constructions that are illogical or nonsensical, or that render a statute meaningless" (cleaned up)).[8]

## *II. Statutory Text*

We begin by exploring the juvenile delinquency and violation-of-probation process, highlighting the statutory provisions and Maryland Rules that are most relevant to the issues before us: CJP §§ 3-8A-19 and 3-8A-19.6, and Maryland Rules 11-423 and 11-424.

---

[8] The same principles of statutory construction are used to interpret the Maryland Rules. *Davis v. Slater*, 383 Md. 599, 604 (2004).

14

Juvenile delinquency proceedings have two initial phases. First, the juvenile court determines whether the child was involved in a delinquent act. This happens at the "adjudicatory hearing." CJP § 3-8A-01(b). Then, the court decides whether the child needs guidance, treatment, and rehabilitation and, if so, the nature of that intervention. This happens at the "disposition hearing."[9] CJP § 3-8A-01(p). This case is about what a juvenile court may do after making its initial disposition.

*A. Disposition*

The juvenile court's disposition options are set out in CJP § 3-8A-19(d)(1) & (2):

> (1) In making a disposition on a petition under this subtitle, the court may:
>
> (i)    Subject to § 3-8A-19.6 of this subtitle, place the child on probation or under supervision in his own home or in the custody or under the guardianship of a relative or other fit person, upon terms the court deems appropriate, including community detention;
>
> (ii)   Subject to the provisions of paragraphs (2) and (3) of this subsection, commit the child to the custody or under the guardianship of the Department of Juvenile Services, the Maryland Department of Health, or a public or licensed private agency on terms that the court considers appropriate to meet the priorities set forth in § 3-8A-02 of this subtitle, including designation of the type of facility where the child is to be accommodated, until custody or guardianship is terminated with approval of the court or as required under § 3-8A-24 of this subtitle; or

---

[9] These hearings may be held on the same day "if notice of the disposition hearing, as prescribed by the Maryland Rules, is waived on the record by all of the parties." CJP § 3-8A-19(b)(2).

15

> > (iii)   Order the child, parents, guardian, or custodian of the child to participate in rehabilitative services that are in the best interest of the child and the family.

> (2) In addition to the provisions of paragraph (1) of this subsection, in making a disposition on a petition, the court may adopt a treatment service plan, as defined in § 3-8A-20.1 of this subtitle.

Not every disposition option, however, is available to the juvenile court for every delinquent act. Even before the JJRA, a child could not be committed generally to DJS for out-of-home placement if "the most serious offense" was one of eight enumerated delinquent acts:

1. Possession of marijuana under § 5-601(c)(2)(ii) of the Criminal Law Article;

2. Possession or purchase of a noncontrolled substance under § 5-618 of the Criminal Law Article;

3. Disturbing the peace or disorderly conduct under § 10-201 of the Criminal Law Article;

4. Malicious destruction of property under § 6-301 of the Criminal Law Article;

5. An offense involving inhalants under § 5-708 of the Criminal Law Article;

6. An offense involving prostitution under § 11-303, § 11-306, or § 11-307 of the Criminal Law Article;

7. Theft under § 7-104(g)(2) or (3) of the Criminal Law Article; or

8. Trespass under § 6-402(b)(1) or § 6-403(c)(1) of the Criminal Law Article.

CJP § 3-8A-19(d)(3)(i) (effective 1 Oct. 2021 to 31 May 2022).

16

Until the JJRA, however, the juvenile court could place a child out-of-home for these offenses under certain conditions:

> (ii) A child whose most serious offense is an offense listed in subparagraph (i) of this paragraph may be committed to the Department of Juvenile Services for out-of-home placement if:
>
> 1. The child previously has been adjudicated delinquent for three or more offenses arising from separate and independent circumstances;
>
> 2. The child waives the prohibition described in subparagraph (i) of this paragraph and the court accepts the waiver as knowing, intelligent, and voluntary; or
>
> 3. The court makes a written finding in accordance with subparagraph (iii) of this paragraph.
>
> (iii) A child whose most serious offense is an offense listed in subparagraph (i) of this paragraph may be committed to the Department of Juvenile Services for out-of-home placement if the court makes a written finding, including the specific facts supporting the finding, that an out-of-home placement is necessary for the welfare of the child or in the interest of public safety.

CJP § 3-8A-19(d)(3)(ii) & (iii) (effective 1 Oct. 2021 to 31 May 2022).

The JJRA consolidated the statutory language but broadened the prohibition on out-of-home placement. Now, under CJP § 3-8A-19(d)(3)(i), a child may not be committed to DJS for out-of-home placement if the most serious offense is:

> 1. Possession of cannabis under § 5-601(c)(2)(ii) of the Criminal Law Article;
>
> 2. An offense that would be a misdemeanor if committed by an adult, unless the offense involves a firearm;

3. A technical violation, as defined in § 3-8A-19.6 of this subtitle; or

4. A first-time violation for making a false statement, report, or complaint of an emergency or a crime under § 9-501.1 of the Criminal Law Article.[10]

The JJRA abolished also the statutory exceptions to this prohibition on out-of-home placement.

*B. Probation*

If a court makes a disposition of probation, the child "remain[s] subject to supervision of the court under conditions the court, or the agency designated by it, deems proper, but is not removed from the home." Md. Rule 11-402(b)(5). The JJRA added also durational limits to juvenile probation. *See* CJP § 3-8A-19.6(c). The limits for misdemeanors are spelled out in CJP § 3-8A-19.6(d):

(1) Except as provided in paragraph (2) of this subsection, if the most serious offense committed by a child would be a misdemeanor if committed by an adult, the court may place the child on probation for a period not exceeding 1 year.

(2) Subject to paragraph (3) of this subsection, the court may, after a hearing, extend the probation by periods not exceeding 3 months if the court finds that:

(i)    There is good cause to extend the probation; and

(ii)   The purpose of extending the probation is to ensure that the child completes a treatment or rehabilitative program or service.

_____

[10] This fourth type of offense—first-time "swatting" ("making a false statement, report, or complaint of an emergency or crime") offenses—was added in 2023, after the JJRA. 2023 Md. Laws chs. 698 & 699. We include it here for completeness, but it is not at issue in this case.

     (3) The total period of the probation, including extensions of
      the probation, may not exceed 2 years.

### *C. Violations of Probation*

  "Although the statutes are detailed in many respects, they do not cover all of the necessary procedural requirements." *Court of Appeals of Md. Standing Comm. on Rules of Prac. and Proc.*, 208th Report, at 2 (27 July 2021). For example, before the JJRA, the Maryland Code was silent as to juvenile violations of probation. Even now, the proceedings are governed mostly by the Maryland Rules. Thus, "[a]nyone dealing with a Juvenile Court needs to be aware of both the statutory provisions and the Rules because they mesh." *Id.*

  Until a case is closed, the juvenile court retains discretion to modify its prior orders—including the adjudication and disposition orders—if it "finds that action to be in the best interest of the [child] or the public." Md. Rule 11-423(a). *See also In re Leslie M.*, 305 Md. 477, 482 (1986). This is mechanically how a court addresses a violation of probation. *See In re S.F.*, 477 Md. at 344–45 (Watts, J., dissenting); *see also* Md. Rule 11-424 (derived in part from former Rule 11-116 (2021), which is now Rule 11-423).

  "Proceedings concerning an alleged violation of probation may be initiated by the court on its own initiative or by motion." Md. Rule 11-424(a). The court "hold[s] a hearing to determine whether a violation has occurred and, if so, whether the probation should be revoked or modified." Md. Rule 11-424(c). The JJRA distinguished the two types of violation: technical and non-technical. Only the former is defined. "Technical violation" means a violation of probation that does not involve:

    (i)  An arrest or a summons issued by a commissioner on a
       statement of charges filed by a law enforcement officer;

19

<blockquote>
(ii)    A violation of a criminal prohibition, or an act that would be a violation of a criminal prohibition if committed by an adult, other than a minor traffic offense;

(iii)    A violation of a no-contact or stay-away order; or

(iv)    Absconding.
</blockquote>

CJP § 3-8A-19.6(a)(3).

If the court finds either type of violation, it "shall (1) specify the condition violated and (2) afford the [child] the opportunity, personally and through counsel, to make a statement and to present information in support of or in opposition to any modification of the existing order." Md. Rule 11-424(c). It grants then the motion that initiated the proceedings and modifies the disposition order accordingly.

With the JJRA, the General Assembly added a new tool with which a juvenile court may address non-technical violations. After a hearing, the court may "place the child on a new term of probation for a period that is consistent with the period of probation that may be imposed under [CJP § 3-8A-19.6] for the delinquent act for which the child was originally placed on probation." CJP § 3-8A-19.6(f). In other words, the court may restart the child's term of probation, without running afoul of the durational limits in CJP § 3-8A-19.6(d). Rule 11-424 was amended to reflect this new option, but otherwise remains substantively the same. Md. Rule 11-424(d).

### III. Parties' Textual Interpretations

Both parties contend that the statutory language is clear and unambiguous and supports their respective position. This is often the first sign that the text is, in fact,

ambiguous. At their core, their arguments are similar variations on an ancient theme: "*expressio (or inclusio) unius est exclusio alterius*, or the expression of one thing is the exclusion of another." *Comptroller of Treasury v. Blanton*, 390 Md. 528, 537 (2006).

K.K. focuses on CJP § 3-8A-19.6(f) and Rule 11-424(d). He argues that these provisions provide juvenile courts with but one option when addressing a non-technical violation: the court may restart the child's term of probation. According to K.K., "[n]othing in the probation statute or rule independently authorizes a court to place a child out of the home for a non-technical [violation of probation]." Thus, he concludes, by expressing in the statute just one option for addressing a non-technical violation, the General Assembly excluded all other options; a juvenile court's only choice when responding to non-technical violations is restarting the term of probation.

The State asserts that the outcome here is dictated, instead, by CJP § 3-8A-19(d)(3)(i). It argues that out-of-home placement is prohibited for only technical violations. According to the State, "nothing in [the] plain language of the statute prohibits out-of-home placement for non-technical violations of probation generally *or* for non-technical violations of probation when the underlying delinquent act for which the child is on probation is a non-firearm misdemeanor." Thus, the State concludes, by expressing in the statute a prohibition against out-of-home placement for only technical violations, the General Assembly excluded from that prohibition non-technical violations; a juvenile court may place a child out-of-home for any non-technical violation, regardless of the nature of the original delinquent act.

21

*IV. Textual Analysis*

Under CJP § 3-8A-19.6(f), if a juvenile court finds that a child has committed a non-technical violation of probation, the "court may, after a hearing, place the child on a new term of probation for a period that is consistent with the period of probation that may be imposed under [CJP § 3-8A-19.6] for the delinquent act for which the child was originally placed on probation." We agree with K.K. that this statute is unambiguous, but we disagree that it is restrictive.

We see nothing in the language to convey that CJP § 3-8A-19.6(f) was intended to abrogate the juvenile court's existing discretionary authority, upon finding that a violation occurred, to modify its prior disposition order by revoking or modifying a child's probation. *See* Md. Rules 11-423(a) & 11-424(c). Nor does its language suggest that it is intended generally to be the sole means of addressing a non-technical violation. Rather, when meshed with the Maryland Rules, CJP § 3-8A-19.6(f) simply gives a juvenile court an additional tool for addressing non-technical violations. *See Bethesda Afr. Cemetery*, 489 Md. at 62 ("Generally, . . . the word 'may' in a statute connotes permission or authorization[.]" (cleaned up)). To be sure, the court may use that tool to address only non-technical violations, but it is not the only tool the court may use to do so. *See* Md. Rule 11-424(c) (requiring juvenile courts at any violation of probation hearing "to determine . . . whether the probation should be revoked or modified"). In other words, CJP § 3-8A-19.6(f) and Rule 11-424(d) embody an additional, optional mechanism a juvenile court may employ to address a non-technical violation, but it is not the only mechanism. *See Bethesda Afr. Cemetery*, 489 Md. at 65.

22

We turn to the prohibition against out-of-home placement. Under CJP § 3-8A-19(d)(3)(i), "[i]n making a disposition on a petition[,]" a juvenile court may not place a child out-of-home if the "most serious offense" is "[a]n offense that would be a misdemeanor if committed by an adult, unless the offense involves a firearm[,]" or "[a] technical violation[.]" The statute does not explain how to determine the "most serious offense," nor does it define the term,[11] but including technical violations as a potential "most serious offense" is confusing.

A violation-of-probation proceeding does not result in an independent disposition. Rather, if the juvenile court finds a violation occurred, it grants the motion that initiated the proceeding and modifies its existing disposition order.[12] *See* Md. Rule 11-424. Thus, despite the State's assertion, a violation of probation cannot be viewed in isolation or as entirely separate from the original delinquent act. *Cf. In re S.F.*, 477 Md. at 326 ("[C]onditions of probation must . . . have a rational connection to the offense[.]" (quoting *Allen v. State*, 449 Md. 98, 111 (2016))).

---

[11] Comparing the "seriousness" of offenses arises, most often, in the context of merger and the rule of lenity. *See, e.g.*, *Jones v. State*, 357 Md. 141, 167 (1999). It entails usually an objective comparison of the elements of the offenses—if they are different degrees of the same kind of offense—or their maximum authorized penalties. *See id.*; *Hamrick v. State*, 263 Md. App. 270, 305–06 (2024). Such an objective comparison is not possible in this context because it is unclear what the "maximum authorized penalty" is for a juvenile violation of probation. This uncertainty lends to the statute's ambiguity.

[12] For this reason, it is also questionable whether the court is, in fact, "making a disposition on a petition" after finding a probation violation. The uncertainty of whether the General Assembly intended "making" to include "modifying" lends further to the statute's ambiguity.

Yet the statute suggests implicitly that it is possible for a technical violation to be a child's "most serious offense"; otherwise, its inclusion in CJP § 3-8A-19(d)(3)(i) would appear superfluous. Indeed, the State's argument rests entirely on the presumption that *any* violation of probation is not only an "offense" independent of the original delinquent act that causes the court to "make" a disposition, but is also *always* the "most serious offense" simply by virtue of the child's probationary status. Although perhaps not illogical obviously at first glance, this reading would mean that a child who receives a speeding ticket while on probation[13] for a felony committed an offense more serious than their original delinquent act. Put simply, this construction is "inconsistent with common sense[,]" and we must reject it as such. *In re Colby H.*, 362 Md. 702, 722 (2001) (cleaned up). Because the court does not make an independent disposition upon finding a violation of probation, a technical violation may not logically be the "most serious offense."

Further, without an independent disposition, it is unclear whether a juvenile court, upon finding a non-technical violation, may modify its disposition into one it could not have made originally. In other words, do the restrictions on available dispositions disappear once the initial disposition is made? This question is not answered in the statutory text. We shall therefore move beyond the parties' textual interpretations and examine the legislative history to divine the General Assembly's intent.

---

[13] Which would be a technical violation under CJP § 3-8A-19.6(a)(3)(ii).

## V. Legislative History

As this Court observed in *Logan v. Dietz*, 258 Md. App. 629 (2023), "not all legislative history has equal value[.]" *Id.* at 669 n.10 (quoting Jack Schwartz & Amanda Stakem Conn, *The Court of Appeals at the Cocktail Party: The Use and Misuse of Legislative History*, 54 Md. L. Rev. 432, 437 (1995) ("Schwartz & Stakem Conn")). Indeed, "[t]he legislative sources and documents in a bill file that are most authoritative in any given appeal will vary, depending on the issues presented[.]" *Id.*

When conducting a historical review of a statute, we focus initially on archival legislative history. "Archival legislative history includes legislative journals, committee reports, fiscal notes, amendments accepted or rejected, the text and fate of similar measures presented in earlier sessions, testimony and comments offered to the committees that considered the bill, and debate on the floor of the two Houses[.]" *State v. Phillips*, 457 Md. 481, 488 (2018). We consider views expressed by individual members of the General Assembly during debate "subject to the critical caveat that those views may not have been shared by anyone else and, to that extent, may be irrelevant." *Id.* at 488–89.

Sponsor testimony, committee bill analyses, and committee floor reports "are likely to be especially reliable evidence of the purpose or goal underlying a statute" because they "reflect the views of those most likely to know something about the legislation and to whom other members, for a variety of reasons, tend to defer." Schwartz & Stakem Conn, 54 Md. L. Rev. at 445–46. *See also Johnson v. State*, 258 Md. App. 71, 92 n.20 (2023) (noting that "[f]loor reports are an excellent source of legislative history . . . and this Court frequently relies on them"). Where legislatively-created work groups lead to proposed

25

legislation, "their sources can be invaluable in determining legislative intent." *Logan*, 258 Md. App. at 669 n.10. Further, "material provided by people or organizations at committee hearings" consist generally of "advocacy statements that may have a more limited purpose[,]" but such material "is useful when it addresses controversial provisions in the legislation and thus provides insights on amendments offered during the legislative process." *Id.*

### A. History of the JJRA

In 2019, the General Assembly established the Juvenile Justice Reform Council ("JJRC"), a workgroup comprised of Maryland legislators, prosecutors, defense attorneys, national experts in adolescent development and juvenile justice policy, and representatives of community organizations. *Md. Juv. Just. Reform Council*, Final Report, at 4–5 (Jan. 2021) ("JJRC Final Report"). The JJRC spent three years researching and discussing best practices for the treatment of youth in the juvenile and criminal justice systems. *Id.* They emerged from their conclave in 2021 with a Report based on their research findings and recommendations for legislative reform.

The ethos of the JJRC's recommendations was to shrink formal system involvement for children and invest instead in prevention and informal interventions. Recommendations included, among others, establishing a minimum age of jurisdiction for juvenile courts, limiting the length of juvenile probation, limiting the use of pre-trial detention, and limiting out-of-home placements. *See* JJRC Final Report, at 6-20.

In response to the Final Report, the General Assembly introduced legislation to enact many of the JJRC's recommendations. *See* S.B. 691 (2022); H.B. 459 (2022). When

the Senate bill's sponsor, Senator Jill Carter, introduced S.B. 691, which became eventually the JJRA, to the Judicial Proceedings Committee, she explained that "[j]uvenile court was never intended to mediate schoolyard squabbles or mete out punishment for childish mistakes." *Juvenile Justice Reform*, S.B. 691, S. Jud. Proc. Comm., 2022 Md. Gen. Assemb., at 5:36–6:10 (3 Mar. 2022) (statement of Sen. Jill Carter).[14] In short, "[i]t is time for Maryland's juvenile justice system to focus more on care, not cages." *Id.* at 5:59–6:05. Jenny Egan of the Office of the Public Defender and a member of the JJRC testified in support of the bill and explained that one of its goals was "shrinking [the juvenile justice] system." *Id.* at 49:23 (statement of Jenny Egan, Off. of the Pub. Def.).

As noted above, the JJRA broadened the prohibition on out-of-home placement and abolished the statutory exceptions to that prohibition. Some Senators were concerned about expanding these limitations and how juvenile courts should address non-compliant probationers and repeat low-level offenders. The topic arose many times throughout the legislative process, even as early as when S.B. 691 was first introduced to the Judicial Proceedings Committee. When asked about it during her testimony, Ms. Egan explained that "if [a] child were to have a new offense or to come back to court on a new matter, they would have the ability to go on a longer and a more extended probation." *Id.* at 11:26–11:37.

---

[14] Available at https://mgaleg.maryland.gov/mgawebsite/Committees/Media/false ?cmte=jpr&ys=2022RS&clip=JPR_3_3_2022_meeting_1&billNumber=sb0691 (last visited 29 May 2025).

The topic arose again during a Committee Session while discussing an amendment that, in part, became CJP § 3-8A-19.6(f). Senator Carter explained that, in allowing juvenile courts to restart a child's term of probation after finding a non-technical violation, the amendment was intended to provide a tool to address children who remain uncooperative to the strict compliance of a probation. *Voting Session*, S. Jud. Proc. Comm., 2022 Md. Gen. Assemb. at 1:16:25–1:17:14 (15 Mar. 2022) (statement of Sen. Jill Carter).[15] She elaborated that

> the discussion was based off of this idea that a kid will just not comply and just run the clock out of the finite probation. And so, the thought was, well, if we allow the judge this extra mechanism . . . that it would ensure . . . if there's a reason for the judge to extend the probation, the judge has the authority to do it.

*Id.* at 1:16:25–1:17:14. The Committee adopted ultimately the amendment and issued a favorable report. *See* Floor Report, S.B. 691, at 1.

The Floor Report for S.B. 691 noted that, "[u]nder current law, with limited exception, a child may not be committed to DJS for out-of-home placement if the most serious offense is one of several specified offenses[.]" *Id.* at 5. The Report explained that S.B. 691

> retains the exemption for the marijuana-related offense but repeals the remainder of the specified offenses and instead prohibits a child from being committed to DJS for out-of-home placement for an offense that would be a misdemeanor if committed by an adult, unless the offense involves a firearm, and the child has been adjudicated delinquent on a prior occasion for an offense involving a firearm.

---

[15] Available at https://mgaleg.maryland.gov/mgawebsite/Committees/Media/false?cmte=jpr&clip=JPR_3_15_2022_meeting_2&ys=2022rs (last visited 29 May 2025).

*Id.* at 5–6. It goes on to state separately that "[a] child also may not be committed to DJS for out-of-home placement for a technical violation." *Id.* at 6.

At the bill's second reading before the Senate, Senator Carter assured skeptics that the expanding prohibition of out-of-home placement "does nothing to stop community detention or other kinds of restraints; it's simply that [the child] [is] not committed to an out-of-home placement." Senate Proc. No. 46, 2022 Reg. Sess., at 1:57:26–1:57:36 (18 Mar. 2022) (statement of Sen. Jill Carter).[16] Echoing the JJRC's Final Report, she explained that the rationale for the prohibition "is that for the most minor things, it does more harm to the child, the child's family, the community, to rip a child away from the family and community rather than keep them in education, keep them in services, keep them around support systems." *Id.* at 1:57:26–1:57:57.

Senator Carter emphasized also that the potential for out-of-home placement would remain available through other avenues:

> [E]very single allegation that is not going to be necessarily prosecuted or result in an out-of-home placement under a delinquency finding can *always* be petitioned through a Child in Need of Supervision petition and *always* petitioned in another way through CINA petitions but usually Child in Need of Supervision and every single thing, including if a child needs out-of-home placement is available through that CINS petition.

*Id.* at 2:01:13–2:01:48.

---

[16] Available at https://mgaleg.maryland.gov/mgawebsite/FloorActions/Media/senate-46-?year=2022RS (last visited 29 May 2025).

The bill cleared both chambers without further substantive amendment and, ultimately, the JJRA became law. 2022 Md. Laws ch. 41 (S.B. 691); 2022 Md. Laws ch. 42 (H.B. 459).

### *B. Analysis*

This history demonstrates overwhelmingly that the JJRA was intended to reduce the number of children committed to DJS. *See, e.g.*, Fiscal and Policy Note, S.B. 691, at 8 (anticipating "decreased expenditures associated with facility operations" for DJS because "[t]he bill reduces the number of juveniles in detention and in out-of-home placements"); *Juvenile Justice Reform*, *supra*, at 1:01:42 ("Every aspect of this bill says, 'Get children out of the system.'"). Nothing in the legislative history suggests that the General Assembly intended the prohibition on out-of-home placement to evaporate after the initial disposition is made.

Nor does the history reflect that the General Assembly viewed violations of probation as independent of the original delinquent act. Rather, it reflects that including technical violations in CJP § 3-8A-19(d)(3) was driven by a desire to ensure a child could not be placed out-of-home for one. There was never any discussion, however, about how violation-of-probation proceedings function in juvenile court. This explains why the General Assembly seemed to treat technical violations as a possible "most serious offense" that causes a court to "mak[e] a disposition on a petition," rather than a finding that triggers the court's discretionary authority to modify an existing disposition.

Allowing a juvenile court to modify a disposition order beyond what it could make originally would subvert the General Assembly's clear intent in passing the JJRA—that is,

to shrink the juvenile justice system and reduce out-of-home placements. The General Assembly did not intend for children like K.K., who could not have been placed out-of-home for their original delinquent act and were found later not involved in another delinquent act—one for which, even if they were found involved, they still could not have been placed out-of-home—to be committed nevertheless to DJS for violating their probation. The history makes clear that the General Assembly anticipated non-compliant juvenile probationers. That was expressly why the bill was amended to allow the juvenile court to restart the child's term of probation after finding a non-technical violation. *See Voting Session*, *supra*, at 1:16:25–1:17:14. Confronted with a child who continues to defy the conditions of his/her misdemeanor probation, or one who continues to commit low-level offenses, the General Assembly's envisioned solution was to seek out-of-home placement through alternative avenues, like a CINS ("Child In Need of Supervision") petition filed under CJP § 3-8A-13 and Rule 11-502. *See* Senate Proc. No. 46, *supra*, at 2:01:13–2:01:58. The history makes clear also, however, that the General Assembly did not intend a child who commits a misdemeanor (not involving a firearm) to be removed from his/her home through the delinquency process, even if he/she violates probation. Whatever our individual thoughts may be as to the wisdom of the General Assembly's objective is neither here nor there. The intent of the General Assembly, made manifest in the relevant legislative history, is clear and neither illogical nor nonsensical. Therefore, our inquiry is at its end.

**CONCLUSION**

We hold, therefore, that where out-of-home placement was not an available disposition for the underlying delinquent act, it does not become available after finding a subsequent non-technical violation of probation. The array of disposition options is set by the original adjudication. Upon finding that a non-technical violation occurred, CJP § 3-8A-19.6(f) adds the option to restart the term of probation, and the juvenile court always retains discretion under Rule 11-423 to modify the conditions of the probation or to adjust its disposition into any other option it could have made originally. Nothing authorizes the court to venture beyond those boundaries. The statutory restraints on available dispositions do not fall away once the judgment is entered. "Any other interpretation would not only frustrate the legislature's purpose in passing the [JJRA], but also recreate the evil that the legislature sought to cure thereby." *Fuge v. Fuge*, 146 Md. App. 142, 171 (2002) (cleaned up). Thus, although it may have little practical effect for K.K. in light of our mootness determination, we reverse the circuit court's judgment for the benefit of Bench and Bar going forward.

**MOTION TO DISMISS DENIED. JUDGMENT OF THE CIRCUIT COURT FOR FREDERICK COUNTY REVERSED. COSTS TO BE PAID BY APPELLEE.**

32